### UNITED STATES v. SWIFT et al.

#### (District Court, N. D. Illinois. March 22, 1911.)

#### No. 4,509.

1. CRIMINAL LAW (§ 42*)—IMMUNITY TO ONE FURNISHING EVIDENCE—STATUTE GOVERNING INVESTIGATIONS BY COMMISSIONER OF CORPORATIONS.
    The immunity statute governing the giving of testimony before the Commissioner of Corporations is Act Feb. 11, 1893, c. 83, 27 Stat. 443 (U. S. Comp. St. 1901, p. 3173), expressly made applicable by Act Feb. 14, 1903, c. 552, § 6, 32 Stat. 827 (U. S. Comp. St. Supp. 1909, p. 92), creating the Department of Commerce and Labor.
    [Ed. Note.—For other cases, see Criminal Law, Dec. Dig. § 42.*]

2. CRIMINAL LAW (§ 42*)—IMMUNITY TO WITNESS—CONSTRUCTION OF STATUTE.
    Immunity Act Feb. 11, 1893, c. 83, 27 Stat. 443 (U. S. Comp. St. 1901, p. 3173), which relates to evidence given in government investigations, and provides that "no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he may testify or produce evidence, * * *" was enacted to satisfy the demand of the fifth constitutional amendment, and does so by affording the witness absolute immunity from future prosecution for any offense arising out of the transactions to which his testimony relates, and which might be aided, directly or indirectly, thereby, so as to leave no ground on which the constitutional privilege

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Opinion withdrawn on rehearing and judgment of lower court affirmed, Taney v. Penn Nat. Bank, 187 Fed. 689.

may be invoked. It operates as an act of general amnesty for all such offenses; but it is not intended to be, and cannot be made, a shield against prosecution for offenses committed after the testimony is given or the evidence furnished, since a person cannot be said to have been a witness against himself in respect to an offense which had not been committed when the testimony was given.

[Ed. Note.—For other cases, see Criminal Law, Dec. Dig. § 42.*]

3. CRIMINAL LAW (§ 198*)—FEDERAL ANTI-TRUST ACT—CONSPIRACY IN RESTRAINT OF TRADE—ACQUITTAL—EFFECT.

A conspiracy to restrain or monopolize interstate commerce, in violation of the Sherman anti-trust act (Act July 2, 1890, c. 647, § 1, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), is necessarily a continuing one, and its illegality is not alone in the act of confederating or engaging in the conspiracy, but also in its continuation, so that a judgment of conviction or acquittal in a prosecution of those engaged in it is not a bar to their subsequent prosecution for continuing and carrying forward the same conspiracy thereafter, which is a new violation of the law.

[Ed. Note.—For other cases, see Criminal Law, Dec. Dig. § 198.*]

4. CRIMINAL LAW (§ 42*)—IMMUNITY TO ONE FURNISHING EVIDENCE—EFFECT OF STATUTE.

Defendants were indicted in 1905 for conspiracy to monopolize interstate commerce in fresh meats, in violation of the Sherman anti-trust act (Act July 2, 1890, c. 647, § 1, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]); but an acquittal was directed, on the ground that they were immune from prosecution because of testimony given and evidence furnished by them before the Commissioner of Corporations in relation to the transactions which formed the basis for the indictments. Held, that such immunity did not extend to a subsequent prosecution for continuing the same conspiracy thereafter, nor did it obliterate the facts testified to, which, if legally competent and relevant, might be shown in the subsequent prosecution.

[Ed. Note.—For other cases, see Criminal Law, Dec. Dig. § 42.*]

5. INDICTMENT AND INFORMATION (§ 137*)—MOTION TO QUASH—GROUNDS—COMPETENCY OF EVIDENCE BEFORE GRAND JURY.

Except in states having statutes on the subject, courts will not review the evidence received by a grand jury on a motion to quash, for the purpose of passing on its competency.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. § 483; Dec. Dig. § 137.*]

6. CRIMINAL LAW (§ 278*)—PLEAS IN ABATEMENT—GROUNDS.

In the federal courts, a plea in abatement in a criminal case may properly raise an issue of fact as to what evidence was presented to the grand jury.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 638–642; Dec. Dig. § 278.*]

7. WORDS AND PHRASES—"IMMUNITY."

"Immunity" does not mean that no acts in fact were ever done, but that there may be no prosecution in respect thereto. Immunity does not wipe out the history of events.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 4, pp. 3411, 3412.]

8. PARDON (§ 1*)—NATURE OF "PARDON"—"AMNESTY."

A "pardon" or "amnesty" secures against the consequences of one's acts, and not against the acts of themselves. It involves forgiveness; not forgetfulness.

[Ed. Note.—For other cases, see Pardon, Cent. Dig. § 1; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 1, p. 373; vol. 6, pp. 5168–5172; vol. 8, p. 7745.]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Criminal prosecution by the United States against Louis F. Swift and others. On motions to quash and pleas to the indictment, and motion to, strike pleas from files. Motions to quash and to strike denied, and rule on government to reply to pleas.

The indictment in this case charges a combination in restraint of trade and commerce among the several states, and contains five counts. The first, second, and fifth counts charge the engaging by the defendants in the combination therein described "during the ten years next preceding the finding and presentation of this indictment, * * * and therefore continuously and at all times during the three years next preceding the finding and presentation of this indictment." The fourth count charges the engaging in a similar combination "at all times during the three years next preceding the finding and presentation of this indictment," and, further, that "during all the times mentioned in this indictment said defendants, together with other persons whose names are to the jurors unknown, have maintained and made effective an agreement, understanding, and arrangement among themselves whereby they have fixed, regulated, and controlled the prices," etc. The third count charges the engaging in such a combination "continuously and at all times during the three years next preceding the finding and presentation of this indictment," without any subsequent qualifying words as to time.

The separate pleas in abatement filed on behalf of the respective defendants are of two classes: (A) Pleas of those defendants who were impleaded in the indictment of July 1, 1905; (B) pleas of those defendants who were not impleaded in the indictment of 1905. The defendants in this case who were formerly indicted, and whose pleas here are identical, are Louis F. Swift, Edward F. Swift, Charles H. Swift, J. Ogden Armour, Arthur Meeker, Thomas J. Connors, and Edward Morris. Seven separate pleas in abatement have been filed on behalf of each of these defendants.

The first plea is directed at the first count of the indictment. It sets out verbatim the first and seventh counts of an indictment returned on July 1, 1905; the special pleas in bar filed October 23, 1905, by each of those defendants to the former indictment, including the first and seventh counts thereof; the additional special pleas in bar filed on November 22, 1905, to the former indictment; the replications to those special pleas; the verdict of the jury sustaining the special pleas, rendered on March 21, 1906; the judgment on that verdict, entered on March 29, 1906, in favor of those defendants. The plea then sets out certain evidence of and concerning the matters and things heard and considered by the grand jury which returned the indictment of July 1, 1905, and which it avers was also heard by the grand jury which returned the indictment herein; that there was no evidence presented to the grand jury which returned this indictment, of and concerning the engaging by these defendants in the combination described in the first count, other than evidence of and concerning the acts, transactions, matters, and things charged in the indictment of July 1, 1905; that the acts, transactions, matters, and things which are stated and charged in the first count of this indictment are the same acts, transactions, matters, and things which were stated and charged in the first and seventh counts of the indictment of July 1, 1905; that the evidence described was material to the charges contained in the first count of this indictment, and that the consideration of the same by the grand jury was prejudicial to the defendants. The plea closes with averments of diligence.

The second, third, and fourth pleas are identical with the first, save only that they are directed at, respectively, the second, fourth, and fifth counts of this indictment.

The fifth plea responds to the entire indictment. In it is incorporated, by reference, the record fully set out in the first plea, and the averments of diligence. It also avers that after the making of the investigation by the Commissioner of Corporations, as described fully in the special pleas in bar filed to the indictment of July 1, 1905, the Commissioner of Corporations reported the information and data so gathered by him to the President of

the United States, and embodied in the printed volume known as the "Garfield Report," a part of the information obtained from the several defendants; that the Garfield Report is a public document, which is incorporated by reference; that in 1904 and 1905 the Garfield Report and the information and evidence secured from the defendants were delivered to the Attorney General of the United States and to the district attorney for the Northern district of Illinois; and upon information and belief that the Garfield Report and the evidence secured from the several defendants were used by the attorneys for the United States in this proceeding in preparing and searching out evidence against the defendants, which was introduced before and considered by the grand jury returning this indictment; that such evidence, so searched out and prepared with the use and aid of the evidence so secured from the several defendants, which was introduced before the grand jury returning this indictment, was material evidence, and prejudicial to the defendants.

The sixth plea also responds to the entire indictment. The record of the 1905 proceedings set out in the first plea, and the averments of diligence, were also incorporated by reference. In addition it avers that the attorneys for the United States submitted to the grand jury which returned this indictment evidence of and concerning the acts, transactions, matters, and things respecting which the several defendants had previously produced evidence before the Commissioner of Corporations in the course of his investigation, referred to and described in the record of the former proceedings, and respecting which acts, transactions, matters and things the several defendants had become immune from prosecution, as adjudged in the former proceeding; that evidence of and concerning such acts, transactions, matters, and things, respecting which the several defendants were immune, was used by the attorneys for the United States and by the grand jury in preparing and searching out other evidence against the defendants, and the evidence so prepared and searched out was used before and considered by the grand jury; and that such evidence was material and its use prejudicial. Certain portions of the evidence respecting immune transactions was then described, namely, certain corporate records and the testimony of several witnesses, and the averment that such evidence was considered by the grand jury.

The seventh plea also responds to the entire indictment. The 1905 proceedings set out in the first plea, and the averments of diligence were there incorporated by reference. It is also averred that the grand jury which returned this indictment heard evidence which was of and concerning the acts, transactions, matters, and things charged in the indictment of July 1, 1905, and on account of which the several defendants had been adjudged to be immune from prosecution. It describes, also, certain corporate records and the testimony of certain witnesses, which was heard and considered by the grand jury returning the indictment of July 1, 1905, with the averment that it was also heard and considered by the grand jury which returned this indictment. It avers that such evidence was material and prejudicial, and that there was no evidence presented to the grand jury of and concerning the engaging by these defendants in the supposed combination in the indictment herein charged, other than evidence of and concerning the acts, transactions, matters, and things charged in the indictment of July 1, 1905.

Identical motions to quash have been filed on behalf of each of the defendants on whose behalf were presented the foregoing pleas in abatement, and therein is set forth the record of the former proceedings, incorporated by reference to the first plea in abatement; that the attorneys for the United States presented to, and the grand jury returning this indictment heard and considered, evidence respecting the same acts, transactions, matters, and things concerning which the respective defendants had theretofore produced evidence before the Commissioner of Corporations; that the grand jury returning this indictment heard evidence of and concerning the same acts, transactions, matters, and things respecting which evidence had been heard and considered by the grand jury which returned the indictment of July 1, 1905, and as to all of which immunity from further prosecution had been adjudged. Certain portions of such evidence were described, namely, corporate records and the testimony of certain witnesses. The motions state

that such evidence was material and prejudicial, and that there was no evidence heard by the grand jury returning this indictment concerning the engaging by these defendants in a combination, other than evidence of and concerning acts, transactions, matters, and things stated and charged in the indictment of July 1, 1905.

(B) Identical pleas in abatement have been filed on behalf of Edward Tilden, Francis A. Fowler, and Louis II. Heyman, defendants herein, who were not impleaded in the indictment of 1905.

The first of these pleas avers and describes the investigation of the fresh meat industry, conducted under a resolution of the House of Representatives, by Commissioner Garfield, in 1904; that in the course of that investigation the defendants were required to furnish evidence respecting the method of business pursued in the conduct of the fresh meat business of certain of the corporations named in the present indictment; that such evidence so furnished related to several of the acts, transactions, matters, and things charged in this indictment; that on March 3, 1905, and afterwards, Commissioner Garfield reported the information and data so gathered by him to the President of the United States, and embodied a part of it in what is known as the "Garfield Report," a public document incorporated therein by reference; that in 1904 and 1905 the Garfield Report and other evidence and information secured from these defendants were delivered to the Attorney General of the United States, and to the district attorney for the Northern district of Illinois, and that the evidence so secured by the Commissioner from these defendants was made use of by the attorneys for the United States in searching out other evidence against them, and which was introduced before, and heard and considered by, the grand jury which returned this indictment; that such evidence was material and prejudicial. The plea ends with an averment of diligence.

In the second plea the three defendants aver and describe the conducting of the Garfield investigation in 1904; that the Commissioner secured evidence and information from them of and concerning acts, facts, circumstances, matters, and things referred to in the present indictment as being and constituting the supposed engaging by the defendants in the unlawful combination; that thereafter the defendants could not be subjected to any penalty or forfeiture for or on account of the respective transactions, matters, and things concerning which they had so testified or produced evidence before the Commissioner; that the attorneys for the United States presented to, and the grand jury which returned this indictment heard and considered, evidence of and concerning the same acts, transactions, matters, and things respecting which the defendants had produced evidence before the Commissioner of Corporations, and for and on account of which they had become and were immune from prosecution; that the evidence consisted in part of certain corporate records and the testimony of certain witnesses, who are referred to; that the attorneys for the United States and the grand jury which returned this indictment used evidence of and concerning transactions respecting which these defendants were immune from prosecution in preparing and searching out other evidence against them, and the grand jury which returned this indictment heard and considered such evidence so prepared and secured; that all of such evidence was material and prejudicial; and that the defendants were diligent in presenting the matter to the court.

The third plea on behalf of these three defendants is identical with the second, excepting that it avers upon information and belief that there was no evidence presented to the grand jury of and concerning the engaging by the defendants in the supposed combination charged in the indictment, other than evidence of and concerning the acts, transactions, matters, and things respecting which the defendants had theretofore produced evidence before the Commissioner of Corporations, and respecting which they had thereby become and were immune from prosecution.

Motions to quash were filed on behalf of Tilden, Fowler, and Heyman, containing statements descriptive of the Garfield investigation in 1904; that the defendants were required to furnish evidence in the course of such investigation; the compilation of the Garfield Report, which was incorporated by reference; that the report and the evidence secured from the defendants

were in 1904 and 1905 obtained by the attorneys for the United States, and were used by them in preparing and searching out'evidence against the defendants, all of which was introduced, heard, and considered in the investigation and proceeding before the grand jury which returned the present indictment; that the grand jury heard and considered evidence of and concerning the same acts, transactions, matters, and things respecting which evidence had been secured from the defendants by the Commissioner of Corporations in the course of his investigation, and used such evidence in preparing and searching out other evidence, which was also used and offered against the defendants; that part of the evidence consisted of corporate records and the testimony of certain witnesses; that there was no evidence presented to the grand jury of and concerning the engaging by the defendants in the supposed combination charged in the indictment, other than evidence of and concerning the acts, transactions, matters, and things respecting which the defendants had theretofore produced evidence before the Commissioner of Corporations; that the evidence used was material and prejudicial. The matters and things set forth and averred in the plea in abatement were incorporated by reference.

The government moved to have the motions to quash the indictment denied and the pleas in abatement stricken from the files. The defendants asked to have the motions to quash sustained, or for a rule on the government to reply within a short day to the pleas in abatement.

Geo. W. Wickersham, Atty. Gen., Edwin W. Sims, U. S. Atty., and Wm. S. Kenyon, James H. Wilkerson, Pierce Butler, James M. Sheean, Oliver E. Pagan, Elwood G. Godman, and Barton Corneau, for the United States.

John S. Miller, Moritz Rosenthal, Levy Mayer, George T. Buckingham, M. W. Borders, Albert Veeder, Ralph Crews, Alfred R. Urion, and Henry Veeder, for defendants.

CARPENTER, District Judge (after stating the facts as above). The broad question before the court for decision is the same, whether raised by the motions to quash or by the pleas in abatement; and inasmuch as the government's motion to strike the pleas in abatement from the files involves certain technical questions of criminal procedure, I shall dispose first of the motions to quash.

Stripped of all unessentials, the case is this: In 1904 all of the defendants gave information and evidence (whether under compulsion or not is immaterial, so far as the present investigation is concerned) to the Commissioner of Corporations, an officer in the Department of Commerce and Labor. What that information and evidence was we are not now informed, but may assume that it related to interstate commerce in the fresh meat industry. In 1905 a federal grand jury in this district indicted the defendants (except Tilden, Fowler, and Heyman), under the Sherman act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), for combining and conspiring together in restraint of trade and commerce in fresh meat among the several states. Special pleas in bar were interposed, averring that the information and evidence given by the defendants to Commissioner Garfield had been turned over to the Department of Justice, and by it presented to the grand jury, which returned a true bill based thereon, and that the defendants, by reason of having given the information and evidence, were immune from prosecution concerning the transactions, matters, and things about which they had testified or

furnished evidence. Issue was joined on those pleas, and on March 21, 1905, a jury, by direction of the District Judge, rendered a verdict of not guilty. Subsequently judgment was entered on that verdict.

In September, 1910, a federal grand jury returned an indictment against all of the defendants, charging them, in violation of the Sherman act, with combining and confederating together in restraint of trade in fresh meat between the several states, etc., for the "past ten years," and "continuously and at all times during the three years next preceding the finding and presentation of this indictment."

By motions to quash this indictment, and by pleas in abatement (identical as to pertinent facts), the defendants make the issue that by having given information and evidence to the Commissioner of Corporations in 1904 they became immune from prosecution in 1905, as was determined by a judgment of record in this court, and that the "immunity statute in question forbids, not only their indictment for or on account of the transactions, matters, and things for which they are immune, but also the use of the immune transactions in aid of a prosecution for a continuation of the immune offense," and that "the inclusion of such immune transactions in the (present) indictment is a violation of their rights under the fifth amendment to the federal Constitution and the immunity statute."

The motions state and the pleas aver that no evidence was presented to the grand jury which returned the present indictment, except of the transactions, matters, and things concerning which the defendants gave information to the Commissioner of Corporations in 1904, and concerning which they have been adjudged to be immune from prosecution.

In short, the question now presented is: Assuming that the defendants informed the Commissioner in 1904 that they were conspiring or combining together in violation of the Sherman act, was the immunity granted to them by the statute, and by the judgment of this court, so perfect that they may continue indefinitely in their unlawful undertaking?

[1] The pertinent immunity act is that of February 11, 1893 (27 Stat. 443 [U. S. Comp. St. 1901, p. 3173]), which provides:

"That no person shall be excused from attending and testifying or from producing books, papers, tariffs, contracts, agreements and documents * * * on the ground or for the reason that the testimony or evidence, documentary or otherwise, required of him, may tend to criminate him or subject him to a penalty or forfeiture. But no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence, documentary or otherwise," etc.

The provisions of the appropriation act of February 25, 1903 (32 Stat. 854, 903, 904, c. 755), urged by defendants' counsel to be involved, have no bearing upon the question, because they claim to have received immunity by virtue of testimony given in an investigation carried on by the Commissioner of Corporations, and the immunity provision of the act of February 25, 1903, applies only to causes arising under (1) the act to regulate commerce (Act Feb. 4, 1887, c. 104,

24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]); (2) the Sherman act; and (3) the customs act (Act June 10, 1890, c. 407, 26 Stat. 131 [U. S. Comp. St. 1901, p. 1886]).

The act making the provisions of the statute of February 11, 1893, applicable to investigations conducted by the Bureau of Corporations is the act of February 14, 1903 (32 Stat. 825 [U. S. Comp. St. Supp. 1909, p. 87]), establishing the Department of Commerce and Labor, section 6 of which provides that the provisions of the act of February 11, 1893, shall apply to witnesses subpœnaed by the Commissioner of Corporations.

[2] It seems necessary at the outset to consider the scope of the constitutional protection and the character and scope of the protection necessary to be afforded in immunity acts, in order to supplant the constitutional privilege. The fifth amendment to the Constitution provides:

"Nor shall any person be compelled in any criminal case to be a witness against himself."

The first statute of immunity offered as the equivalent of the constitutional shield was the act of February 25, 1868 (15 Stat. 37, c. 13). This statute later was re-enacted into section 860 of the Revised Statutes (U. S. Comp. St. 1901, p. 661), in the following language:

"No pleading of a party, nor any discovery or evidence obtained from a party or witness by means of a judicial proceeding in this or any foreign country shall be given in evidence or in any manner used against him or his property or estate, in any court of the United States in any criminal proceeding, or for the enforcement of any penalty or forfeiture: Provided, that this section shall not exempt any party or witness from prosecution and punishment for perjury committed in discovering or testifying, as aforesaid."

Section 860 was before the Supreme Court of the United States in Counselman v. Hitchcock, 142 U. S. 547, 12 Sup. Ct. 195, 35 L. Ed. 1110, and was held to afford an insufficient compensation for the privilege granted by the fifth amendment. The court said:

"We are clearly of the opinion that no statute, which leaves the party or witness subject to prosecution after he answers the incriminating questions put to him, can have the effect of supplanting the privilege conferred by the Constitution of the United States. Section 860 of the Revised Statutes does not supply a complete protection from all the perils against which the constitutional prohibition was designed to guard, and is not a full substitute for that prohibition. In view of the constitutional provision, a statutory enactment to be valid must afford absolute immunity against future prosecutions for the offense to which the question relates."

To meet the requirements of the rule thus laid down by the Supreme Court, the act of February 11, 1893, was passed, providing that:

"No person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he may testify or produce evidence, documentary or otherwise," etc.

In this form the matter was presented in Brown v. Walker, 161 U. S. 591, 16 Sup. Ct. 644, 40 L. Ed. 819, where a majority of the court held, after quoting extensively from the opinion in Counselman v. Hitchcock:

**186 F.—64**

"The clause of the Constitution in question is obviously susceptible of two interpretations. If it be construed literally as authorizing the witness to refuse to disclose any fact which might tend to incriminate, disgrace, or expose him to unfavorable comments, then as he must necessarily, to a large extent, determine upon his own conscience and responsibility whether his answer to the proposed question will have that tendency, * * * the practical result will be that no one could be compelled to testify to a material fact in a criminal case unless he chose to do so, or unless it was entirely clear that the privilege was not set up in good faith. If, upon the other hand, the object of the provision be to secure the witness against a criminal prosecution which might be aided, directly or indirectly, by his disclosure, then if no such prosecution be possible—in other words, if his testimony operated as a complete pardon for the offense to which it relates—a statute absolutely securing to him such immunity from prosecution would satisfy the demands of the clause in question. * * *

"Stringent as the general rule is, however, certain classes of cases have always been treated as not falling within the reason of the rule, and therefore constituting apparent exceptions. When examined, these cases will all be found to be based upon the idea that, if the testimony sought cannot possibly be used as a basis for or in aid of a criminal prosecution against the witness, the rule ceases to apply; its object being to protect the witness himself, and no one else—much less that it shall be made use of as a, pretext for securing immunity to others. * * *

"The act of Congress in question, securing to witnesses immunity from prosecution, is virtually an act of general amnesty, and belongs to a class of legislation which is not uncommon, either in England or in this country. Although the Constitution vests in the President 'power to grant reprieves and pardons for offenses against the United States, except in cases of impeachment,' this power has never been held to take from Congress the power to pass acts of general amnesty, and is ordinarily exercised only in cases of individuals after conviction, although, as was said by this court in Ex parte Garland, 4 Wall. 333, 380 [18 L. Ed. 366], 'it extends to every offense known to the law, and may be exercised at any time after its commission, either before legal proceedings are taken, or during their pendency, or after conviction and judgment. * * *

" * * * Amnesty is defined by lexicographers to be an act of the sovereign power granting oblivion or a general pardon for a past offense, and is rarely, if ever, exercised in favor of single individuals, and is usually exerted in behalf of certain classes of persons who are subject to trial, but have not yet been convicted. * * *

"It is entirely true that the statute does not purport, nor is it possible for any statute, to shield the witness from the personal disgrace or opprobrium attaching to the exposure of his crime; but as we have already observed the authorities are numerous and very nearly uniform to the effect that if the proposed testimony is material to the issue on trial, the fact that the testimony may tend to degrade the witness in public estimation does not exempt him from the duty of disclosure. A person who commits a criminal act is bound to contemplate the consequences of exposure to his good name and reputation, and ought not to call upon the courts to protect that which he has himself esteemed to be of such little value. The safety and welfare of an entire community should not be put into the scale against the reputation of a self-confessed criminal, who ought not, either in justice or in good morals, to refuse to disclose that which may be of great public utility in order that his neighbors may think well of him. The design of the constitutional privilege is not to aid the witness in vindicating his character, but to protect him against being compelled to furnish evidence to convict him of a criminal charge. If he secure legal immunity from prosecution, the possible impairment of his good name is a penalty which it is reasonable he should be compelled to pay for the common good. If it be once conceded that the fact that his testimony may tend to bring the witness into disrepute, though not to incriminate him, does not entitle him to the privilege of silence, it necessarily follows that if it also tends to incriminate, but at the same time operates as a pardon for the offense, the fact that the disgrace remains no more entitles him to immunity in this case than in the other."

In Hale v. Henkel, 201 U. S. 43, at page 67, 26 Sup. Ct. 370, at page 376, 50 L. Ed. 652, the court said:

"The interdiction of the fifth amendment operates only when a witness is asked to incriminate himself—in other words to give testimony which may possibly expose him to a criminal charge. But if the criminality has already been taken away, the amendment ceases to apply. The criminality provided against is a present not a past criminality, which lingers only as a memory, and involves no present danger of prosecution. * * * The extent of this immunity was fully considered by this court in Counselman v. Hitchcock, 142 U. S. 547 [12 Sup. Ct. 195, 35 L. Ed. 1110], in which the immunity offered by Rev. Stat. § 860, was declared to be insufficient. In consequence of this decision an act was passed applicable to testimony before the Interstate Commerce Commission, in almost the exact language of the act of February 25, 1903, above quoted. This act was declared by this court in Brown v. Walker, 161 U. S. 591 [16 Sup. Ct. 644, 40 L. Ed. 819], to afford absolute immunity against prosecution for the offense to which the question related, and deprived the witness of his constitutional right to refuse to answer. Indeed, the act was passed apparently to meet the declaration in Counselman v. Hitchcock, 142 U. S. 589 [12 Sup. Ct. 195, 35 L. Ed. 1110], that 'a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offense to which the question relates.'"

An analysis of the three cases just quoted from shows that there is no such thing as a constitutional right of absolute silence in all cases. The constitutional right is limited to those cases only in which speech would incriminate, and it follows that if the answer to the question cannot tend in any way to incriminate the witness, because liability to prosecution on account of anything about which he may testify has been removed, there is no ground on which the constitutional privilege can be invoked. The immunity act gives no substitute for this constitutional privilege. The privilege continues to exist to its fullest extent in any case in which the answer may tend to incriminate. The Congress of the United States had no power to take away the privilege, to abridge it, or to substitute anything for it. The most that Congress could do was to remove any criminality which might result from the answering of the question or the giving of the evidence. When that was done, the situation became such that the constitutional privilege did not apply, and could not be relied upon. It became, so far as the witness was concerned, as though his acts never had been criminal, and as though his testimony under no circumstances could incriminate him.

As to the claim that the immunity is for the future as well as in the past, it may be observed that in Brown v. Walker, supra, the court said:

"If, upon the other hand, the object of the provision [the fifth amendment] be to secure the witness against a criminal prosecution which might be aided, directly or indirectly, by his disclosure, then if no such prosecution be possible—in other words, if his testimony operated as a complete pardon for the offense to which it relates—a statute absolutely securing to him such immunity from prosecution would satisfy the demands of the clause in question."

The words "complete pardon for the offense to which it relates" indicate clearly that there must have been some violation of the law at the time the evidence was given. In Hale v. Henkel, supra, the court said:

"But, if the criminality has already been taken away, the amendment ceases to apply. The criminality provided against is a present, not a past, criminality, which lingers only as a memory and involves no danger of prosecution."

If the amendment does not apply to a past criminality, which lingers only as a memory, a fortiori it cannot apply to future criminality, not yet conceived in the minds of the parties. In the Counselman Case, supra, the court said:

"In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offense to which the question relates."

A question put to a witness cannot relate to something which does not exist. As to all crimes committed at the time the information was had from the defendants, there may have been immunity. It cannot be claimed now as to crimes which had not then been committed, or even contemplated. That this is true follows conclusively from the fact that the constitutional privilege guards only against the giving of incriminating evidence. Incriminating evidence cannot be given, unless a crime in fact has been committed.

What were the offenses here to which the "questions related"? Obviously, if the present indictment contemplates a crime supposed to have been committed within three years prior to its return (and it is clear that it does), then the old immune evidence did not and could not relate to the offense charged.

The claim of the defendants is, as I have analyzed the arguments of their counsel, that as to the matters, transactions, and things about which they testified in 1904, and as to everything related thereto or resulting therefrom, there can be no prosecution in 1910. I do not decide, and it is not necessary for me to decide, the same question which was presented to Judge Humphrey in 1905. United States v. Armour (D. C.) 142 Fed. 808. What I must decide is whether, granting that the defendants were entitled to immunity from prosecution for any crime committed at the time they testified before Commissioner Garfield, they are now immune, and forever will be immune, from prosecution for any acts concerning, or discovered by reason of, the matters, transactions, and things about which they then testified.

[3] It may be well to consider what is meant by a conspiracy or combination, as defined in the Sherman act. At common law the existence of the conspiracy agreement or confederation constituted the crime, without even a single overt act in pursuance of it. Bannon et al. v. United States, 156 U. S. 464, 15 Sup. Ct. 467, 39 L. Ed. 494. The gist of the offense, therefore, is the fact of confederating. Section 5440 of the Revised Statutes (U. S. Comp. St. 1901, p. 3676) has not altered the nature of the offense, or the rules of law governing it, save in one particular, namely, that the conspiracy may not now be prosecuted until one overt act has been committed. Section 5440 gives a locus pœnitentiæ until the commission of some overt act. After the commission of such overt act, the law of conspiracy is unaffected by that section. United States v. Britton, 108 U. S. 199, 2 Sup. Ct. 531,

27 L. Ed. 698; Bannon et al. v. United States, 156 U. S. 464, 15 Sup. Ct. 467, 39 L. Ed. 494; Williamson v. United States, 207 U. S. 425, 28 Sup. Ct. 163, 52 L. Ed. 278.

If, then, a conspiracy is indictable at common law before any overt act, likewise it must be indictable at common law at any time after the commission of an overt act, if the conspiracy agreement or confederation still exists. A conspiracy agreement to accomplish an unlawful object is, in its very nature, a continuing arrangement between the conspirators, the duration of which will depend upon the nature of the object which they propose to accomplish. Considering the infinite variety of possible conspiracies, both as to plan and purpose, it is impossible to lay down any unvarying rule concerning the extent of their duration, other than to say that they continue until they are abandoned, or the object of the conspiracy is accomplished. So long as the parties contemplate further action, if necessary to the attainment of their ultimate object, the agreement or confederation still exists. This further action may consist alone in accepting the benefits of an agreement previously made.

In United States v. Kissel (decided by the Supreme Court of the United States December 12, 1910) 218 U. S. 601, 31 Sup. Ct. 124, 54 L. Ed. 1168, Mr. Justice Holmes said:

"A conspiracy to restrain or monopolize trade by improperly excluding a competitor from business contemplates that the conspirators will remain in business and will continue their combined efforts to drive the competitor out until they succeed. If they do continue such efforts in pursuance of the plan, the conspiracy continues up to the time of abandonment or success. A conspiracy in restraint of trade is different from and more than a contract in restraint of trade. A conspiracy is constituted by an agreement, it is true; but it is the result of the agreement, rather than the agreement itself, just as a partnership, although constituted by a contract, is not the contract, but is a result of it. The contract is instantaneous. The partnership may endure as one and the same partnership for years. A conspiracy is a partnership for criminal purposes. That as such it may have continuation in time is shown by the rule that an overt act of one partner may be the overt act of all, without any new agreement specifically directed to that act."

In United States v. Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007, the contract forming the defendant association had been made before the Sherman act was passed; but a continuance of the association after the enactment of the statute was held to be within the prohibition. Mr. Justice Peckham said:

"It is said that to grant the injunction prayed for in this case is to give the statute a retroactive effect; that the contract, at the time it was entered into, was not prohibited or declared illegal by the statute, as it had not then been passed; and to now enjoin the doing of any act which was legal at the time it was done would be improper. We give to the law no retroactive effect. The agreement in question is a continuing one. The parties to it adopt certain machinery and agree to certain methods for the purpose of establishing and maintaining in the future reasonable rates for transportation. Assuming such action to have been legal at the time the agreement was entered into, the continuation of the agreement, after it had been declared to be illegal, became a violation of the act. The statute prohibits the continuing or entering into such an agreement for the future, and if the agreement be continued it then becomes a violation of the act. There is nothing of an ex post facto character about the act. The civil remedy by injunction and the liability to punishment under the criminal provisions of the act are entirely

distinct, and there can be no question of any act being regarded as a violation of the statute which occurred before it was passed. After its passage, if the law be violated, the parties violating it may render themselves liable to be punished criminally; but not otherwise."

In Northern Securities Co. v. United States, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679, the court, under the Sherman act, restrained a continuance of a combination already formed. This must have been because such continuance was as much condemned by the act as its original formation.

In United States v. MacAndrews (C. C.) 149 Fed. 823, Judge Hough, in overruling a demurrer to an indictment charging a violation of sections 1 and 2 of the Sherman act, said:

"It is true that the gist of the alleged offense is the combination or the attempt at monopoly, but it is not true that the offenses are complete when the combination is mentally formed or the mental intention to monopolize arises. The statutory offense, and the one charged herein, does not depend upon 'a single agreement, but [on] a course of conduct intended to be continued'; yet, nevertheless, 'the thing done and intended to be done is perfectly definite.' Swift v. United States, 196 U. S. 400 [25 Sup. Ct. 276, 49 L. Ed. 518]. That case arose on the civil side of the court; but it is to be remembered that the same facts and acts which expose violators of this statute to civil suits also render them subject to indictment. In this case, while the time is indefinite, the thing done is definite, and that is all that the statute requires.

"To show that an exact time may be, and therefore must be, assigned for the commission of the offense of combination, the defendants argue upon the meaning of the word 'engage' as used in the statute, and strenuously urge that, since the offense prohibited is that of 'engaging in' a combination, it must be complete as soon as the accused employs his attention or effort in or about the same, that such employment of attention or effort is capable of precise assignment in point of time, and they challenge the prosecution to name the day.

"The statute is not directed against such an abstraction as this. It does not require on the part of the prosecution clairvoyance to discover or locate the offense. Its prohibition is not directed against a state of mind, but against a state of facts. The facts do not simultaneously occur; the events are not contemporaneous. It may, and naturally would, require time for the working parts of the combination to become co-operative; or for the monopoly to become more than a hope; and what is forbidden and renders the actors obnoxious to the criminal law is not an undiscoverable thought or hope, but a perfectly obvious result or condition. The condition or state of facts against which the statute is directed is a continuing condition, and therefore the offense of creating and maintaining that condition is necessarily a continuing offense, and does not, from its very nature, require greater particularity in assignment than is used in this indictment."

The books say sometimes that each overt act "renews" the conspiracy. This can be true only in the sense that the overt act constitutes renewed or further evidence of the continued existence of the conspiracy. A conspiracy is always required to support the overt act. A conspiracy agreement commonly continues in actual existence until after the object of the conspiracy has been accomplished. Its actual continuance always is a question of fact, and the indictment in this case charges a continued actual existence of the conspiracy from its inception in 1904, up to the time of the return of the indictment.

Is the original confederation or unlawful agreement the only violation of the statute, or is a continuation or carrying out of that agree-

ment, evidenced by a conscious participation therein by the parties, equally a violation of the law? The fact that conspiracies generally may be, and usually are, continuing agreements or understandings, emphatically is true of conspiracies to restrain or to monopolize commerce. In such cases, not only may the conspiracy endure, as in the case of conspiracies generally, until a single complete result is effected, but the result intended by the conspirators is itself, quite inevitably, a continuing condition of things. Restraint or monopolization of commerce for a moment or a day is not the object of a conspiracy to restrain or monopolize it. The conspirators seek continuous restraint and monopolization.

The argument of the defendants is that the crime of conspiracy is noncontinuing, because the essential element of the offense is the act of confederating or plotting, which is in itself inherently a noncontinuing act. The authorities which have just been cited are to the contrary. The question of the continuous or noncontinuous nature of a conspiracy depends entirely upon the agreement of the parties and the object to be effected. It is always possible that the conspiracy or confederation itself may contemplate a continuous course of action on the part of those engaged in it. An agreement to pursue an illegal course for 10 or 15 years, by its very nature, would be an agreement which was continuous. Take a concrete case. Assume that the defendants in 1904 entered into a written agreement to stifle competition, or to control prices, in the fresh meat industry through the medium of the National Packing Company. Would indictment and conviction in 1905 have given them an everlasting license to continue their unlawful acts, exempt and immune from prosecution?

[4] It must be conceded that, had the defendants been convicted in 1905, no question of immunity arising, no further prosecution could be had for the same offense. If, however, the conspiracy having been entered into and the various media through which it was to be made operative and effective having been created, all in 1904, proof of the facts upon which the former conviction was had (properly safeguarded by the rules of evidence) could be shown in a prosecution instituted in 1910, based upon a continuous conscious participation by the defendants in the original undertaking; that is to say, the continued operation of the unlawful combination, notwithstanding the former conviction, is in itself a new violation of the law. The indictments in this case are not for any crime committed at the time the privileged evidence was given, but for a subsequent crime, and that subsequent crime consists in the continuation of the original agreement.

Again, suppose in 1904 the defendants admitted to the Commissioner of Corporations that they had conspired together to restrain the fresh meat trade in this country. Suppose that the confession were used to search out other evidence tending to show that the conspiracy organized in 1904 had been in continuous operation up to and including the month of September, 1910. Can they stand boldly upon the proposition that with respect to those matters, transactions, and things which they had confessed they are immune for all time to

come? Not only immune from punishment concerning the things of the past which they disclosed, but immune from punishment for continuing in their unlawful engagement? Not only that, but immune from the use of the evidence against them for any purpose at any time thereafter?

Immunity does not mean license. If it does, then one need only to confess his crime, and his license to violate the law becomes perpetual. Any consideration of the so-called immunity or constitutional privilege which results in the giving of license to continue an unlawful act, or immunity from prosecution for future crime, would be intolerable.

The defendants must rest squarely upon the proposition that the immunity granted by the statute is broader than the privilege of the Constitution. However, both the Constitution and the immunity statute apply only to incriminating evidence; the former by construction given by the Supreme Court of the United States, and the latter by its very terms.

I cannot agree that the immunity act purposely was made attractive as a kind of bonus or bribe to induce innocent disclosures by the promise that a future crime concerning the acts, transactions, and things testified about would pass unpunished. I do not believe that the defendants here accused are immune for all time to come from the punishment prescribed by the Sherman act, with respect to interstate commerce in meat in this country. No matter how the arguments of counsel are analyzed, they lead ever to that result. It must follow, if their position is sound, that a general statement of one's business made to the Commissioner of Commerce and Labor will prevent the government from using such information in any way, for the purpose of ferreting out or prosecuting future crimes connected with that business.

The defendants claim, also, that the use of privileged or immune evidence before the 1910 grand jury was a violation of their constitutional rights; that the evidence was itself "unconstitutional," as distinguished from "incompetent"; that the immunity or amnesty or pardon afforded by the fifth amendment and the immunity act obliterated the acts themselves about which they had furnished evidence to Garfield. In this connection, much stress has been laid upon cases involving pardons. It is urged that:

"The legal effect of the pardon or amnesty (the same thing) is to wholly obliterate the offense, and all its consequences; to furnish a legal equivalent for conclusive proof that the pardoned acts never existed."

In other words, after a pardon, there is "oblivion" as to the past. If, however, there be any "oblivion," it is not as to the actual happening of things, but as to the attending consequences. Amnesty or pardon obliterates the offense, it is true, at least to such extent that for all legal purposes the one-time offender is to be relieved in the future from all its results; but it does not obliterate the acts themselves. It puts the offender in the same position as though what he had done never had been unlawful; but it does not close the judicial eye to the fact that once he had done the acts which constituted the

offense, and the cases arising under the pardons and under the general amnesty granted at the close of our Civil War do not support, but, on the contrary, dispel the idea that the acts themselves, as distinguished from their penal consequences, were obliterated by pardon or amnesty. Thus in the Garland Case, 71 U. S. 333, 18 L. Ed. 366, the sole question was whether or not Gen. Garland could be permitted to practice law in the Supreme Court when, because he had held office under the government of the Confederate States, he could not take the then required oath that he had never given aid and comfort to, or held office under, enemies of the United States. The whole controversy arose because the facts were not obliterated, because Garland could not take the oath without being guilty of perjury. Had the facts been obliterated, the simple way out would have been for Gen. Garland to take the oath; but it was admitted on all hands, and stated by the court, that he could not do so.

An officer in the employ of the government, overzealous, perhaps, in the performance of his duty, shoots and wounds seriously a person whom he thinks has been guilty of a crime. The officer had no authority to use violence, and was indicted and held for trial on a charge of assault with intent to kill. The executive, believing that the circumstances warranted his interference, pardons the officer. Does the pardon wipe out the physical fact that he shot and wounded seriously his victim? Does the pardon prevent the victim from recovering damages in a civil action? Clearly, it does not. Certainly it cannot be claimed that the pardon granted in 1861 to Gen. Garland for "taking part in the late rebellion against the government," etc., not only rendered him immune from punishment, but branded him a Union soldier or a noncombatant.

[7] There is nothing in the law of pardons which will warrant the court in reaching a conclusion that the amnesty or immunity claimed to be afforded by the law to the defendants in 1904 wiped out the physical existence of the transactions, matters, and things concerning which they then testified. The difference between a crime committed and forgiven, and its physical occurrence, must not be overlooked. Immunity does not mean that no acts in fact were done, but that there may be no prosecution in respect thereto. Immunity does not wipe out the history of events.

[8] A pardon or amnesty secures against the consequences of one's acts, and not against the acts themselves; it involves forgiveness, not forgetfulness. If the claimed immunity did not obliterate the physical existence of the facts about which the defendants furnished evidence to Garfield in 1904, but merely purged them of criminality and rendered them inherently harmless, there is no legal reason why those facts or the evidence concerning them, if competent and relevant, may not be used to trace the history of, or establish, an unlawful conspiracy charged to have been in operation in 1910.

My conclusion is this: The Constitution guaranteed to the defendants the right of silence only with respect to evidence which might tend to incriminate them. The immunity act rendered the constitutional provision inapplicable, by destroying the incriminating effect of

the evidence given, and by providing absolute immunity from prosecution for any crime already committed concerning the matters, transactions, and things testified about. The immunity furnished related to present, and not future, crimes. That immunity purged the evidence given of all unlawful characteristics, and assured the defendants that up to the time they testified they had done no wicked or wrongful thing. The immunity act did not, and could not, alter or destroy the transactions, matters, and things concerning which the information was furnished. They must exist still as facts, harmless and pure, to be sure, but still tangible facts; and those facts, proper foundation having been laid, and when legally competent and relevant, may be shown at any time, in any action, civil or criminal.

If I am right in my conclusion as to the effect of the fifth amendment and the immunity statutes, upon the evidence given by the defendants to the Commissioner of Corporations in 1904, then the only question remaining is whether the court ought to quash an indictment because incompetent evidence was presented to the grand jury.

[5] The cases are uniform to the effect that, except in those states in which, by statute, indictments are required to be returned on "legal" or "competent" evidence, the courts will not review the evidence received by a grand jury for the purpose of passing upon its competency. In the first place, no official record of the evidence introduced before the grand jury ordinarily is kept. In the second place, if, on a motion to quash, the competency of the evidence presented could be inquired into, the trial courts would be obliged to sit as courts of review, to examine into the correctness of every ruling made upon the evidence by the grand jurors. The obstructions to justice and the unnecessary and uncalled-for waste of time, and consequent expense to the state as well as to defendants, which would result from such a course, are too obvious to need comment.

In addition to this, the grand jurors are laymen. They do not know, and cannot be expected to know, the technical rules of evidence; and while, no doubt, it is the duty of the prosecutor to give them such aid as he may in that respect, he has no control over them. As a matter of fact, under the common law, and in the state of Illinois, where the common law prevails, grand jurors are entitled to indict upon their personal knowledge, and upon their experience as men of affairs, upon what has transpired in the community with reference to the case under their investigation. They cannot be expected to know what evidence is or is not legally competent. If, therefore, indictments are to be quashed because incompetent evidence was heard by the grand jury, the return of a true bill practically will become an impossibility.

The authorities cited by defendants, in which indictments were quashed because the accused was called before the grand jury and examined, or because private counsel was permitted to appear and address the grand jury, are not in point. In those cases the indictments were quashed, not because incompetent evidence was received, but because the proceedings of the grand jury were unconstitutional and unlawful. Clearly, if the grand jury were improperly impaneled,

or if certain classes of persons unlawfully were excluded from serving thereon, the matter could be brought to the attention of the court, and disposed of, by a motion to quash the indictment.

The two propositions are radically different. It is one thing to quash an indictment because the accused, in violation of his constitutional right, is brought before the grand jury and browbeaten or maltreated, or because private counsel is permitted to harangue the jurors. or because other like fundamental wrongs are permitted, and quite another thing to quash an indictment because a witness is asked concerning facts which mayhap do not tend to prove the charge which the grand jury is to inquire into. The one reaches to the organization or fundamental power of the grand jury to act; the other, granting that the grand jury was properly impaneled and had the power to proceed, involves the proposition that it acted upon incompetent evidence, and therefore reached an irrational conclusion.

The motions to quash will be denied, and the clerk will enter an order to that effect.

[6] The pleas in this case raise an issue of fact as to what evidence was presented to the grand jurors. Grand jurors and witnesses before them are sworn not to disclose what takes place in the jury room. The authorities are conflicting as to whether it is proper in a plea in abatement to raise an issue of fact as to matters which the policy of the law requires to be kept secret. The Supreme Court, however, in Hale v. Henkel, supra, used the following language:

"The suggestion that a person who has testified compulsorily before a grand jury may not be able, if subsequently indicted for some matter concerning which he testified, to procure the evidence necessary to maintain his plea, is more fanciful than real. He would have, not only his own oath in support of his immunity, but the notes often, though not always, taken of the testimony before the grand jury, as well as the testimony of the prosecuting officer, and of every member of the jury present. It is scarcely possible that all of them would have forgotten the general nature of his incriminating testimony, or that any serious conflict would arise therefrom"

—indicating that such matters properly may be brought to the notice of the court by plea.

The motion to strike the pleas in abatement from the files will be denied, and a rule entered upon the government to reply. If, however, the government sees fit to file a demurrer to the pleas, inasmuch as all of the parties to this cause have indicated a desire to have the matter disposed of upon the merits, and inasmuch as I have treated the questions involved as if a demurrer had been interposed, such demurrer will be sustained as of course.