**UNITED STATES of America**

v.

**AMERICAN RADIATOR & STANDARD SANITARY CORPORATION et al.**

Cr. A. No. 66–295.

United States District Court
W. D. Pennsylvania.

Dec. 29, 1967.

John C. Fricano, Dept. of Justice, Washington, D. C., for plaintiff.

D. Malcolm Anderson, Thomas M. Kerr, Jr., J. Robert Maxwell, Pittsburgh, Pa., for defendants.

## OPINION

ROSENBERG, District Judge.

The matters before me here consist of four separate motions to dismiss the indictment in this case. First, Stanley S. Backner, an individual defendant and Executive Vice-President of the Plumbing Fixture Manufacturers Association,[1] one of the defendants in this case, and Vice-President in charge of Marketing for the Universal Rundle Corporation, another defendant, seeks dismissal on the ground that he obtained immunity from prosecution when he testified before the Federal Trade Commission in regards to the subject matter contained in the indictment. Second, Wallace-Murray Corporation, another defendant, and John B. Balmer, an individual defendant, who was an officer of the Wallace-Murray Corporation, seek dismissal on the ground that evidence submitted to the grand jury was privileged as communications between them and their attorney. Third, Robert J. Pierson, Jr., an individual defendant and Vice-President of Marketing of Rheem Manufacturing Company, seeks dismissal of the indictment first on the ground that he obtained immunity from prosecution upon his delivery of certain personal books, records and documents into the custody of the grand jury, and second, on the ground that the compelling of the production of his personal books and records before the indicting grand jury was a violation of his rights under the Fifth Amendment. All these defendants con-

---

1. Backner became Vice-President of the Plumbing Fixture Manufacturers Associa- tion on November 5, 1963, succeeding the prior secretary.

tend that by the presentation of the improper or illegal evidence to the grand jury, its proceedings were tainted or poisoned and. the indictment must be dismissed as to each of them.

On October 6, 1966, a grand jury in the United States District Court for the Western District of Pennsylvania returned an indictment naming as defendants the Plumbing Fixture Manufacturers Association, eight major plumbing fixture manufacturers and eight executives, including defendants, Stanley S. Backner, John W. Balmer and Robert J. Pierson, Jr. The indictment charges that beginning some time in September 1962 and continuing thereafter at least until some time in 1966, the defendants and co-conspirators engaged in a combination and conspiracy to raise, fix, stabilize and maintain the prices of enameled cast iron and vitreous china plumbing fixtures in violation of § 1 of the Sherman Act. It is alleged, inter alia, that the defendants and co-conspirators agreed at various times to increase the prices of enameled cast iron and vitreous china plumbing fixtures and to limit maximum discounts thereon, and agreed to discontinue the manufacture of regular enameled cast iron plumbing fixtures which were lower priced than acid-resistant cast iron plumbing fixtures.

On October 24, 1967, I filed an opinion in this action relating to the suppression of evidence and the dismissal of indictments on joint motions of all the defendants in this case, as well as all the defendants in a companion case. I disposed of questions there raised, namely, as to whether or not evidence, if made and obtained in a manner which violated the constitutional rights of the defendants and used in the grand jury proceedings, tainted the proceedings so as to require a dismissal of the indictments.

■ In my opinion of October 24, 1967, I held that although "tainted" evidence may have entered into the grand jury proceedings and brought about the indictments, it would be of no avail to the defendants for the dismissal of the indictments brought by the grand jury. United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966). As stated. by Judge Kalodner of the Court of Appeals for the Third Circuit in a recent decision, United States ex rel. Almeida v. United States, 3 Cir., 383 F.2d 421 (1967), "On this score, it is settled law that * * * an indictment cannot be challenged 'on the ground that there was inadequate or incompetent evidence before the grand jury', Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956); and (3) a prosecution is not abated, nor barred, even where 'tainted evidence' has been submitted to a grand jury, United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966)."

For the same reasons, I cannot find here that the grand jury proceedings, in arriving at the indictment as to the defendants on the motions now before me, were tainted so as to require dismissal of the indictment. The motions for dismissal will be denied. However, since other matters have been raised which are pertinent, I deem it incumbent upon me to discuss these.

*Stanley Backner*

Defendant Stanley Backner contends that he received immunity from prosecution by virtue of the provisions contained in § 9 of the Federal Trade Commission Act, 38 Stat. 722 (1914), 15 U.S.C. § 49.[2]

2. The pertinent part of § 49 of 15 U.S.C. reads as follows: " * * * No person shall be excused from attending and testifying or from producing documentary evidence before the commission or in obedience to the subpoena of the commission on the ground or for the reason that the testimony or evidence, documentary or otherwise, required of him may tend to criminate him or subject him to a penalty or forfeiture. But no natural person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he may testify, or produce evidence, documentary or otherwise, before the commission in obedience to a subpoena issued by it: *Pro-*

From the affidavit of Backner's counsel, the transcript of the hearing before the Federal Trade Commission,[3] and the argument and briefs in support of the motion, the following facts appear: On the 15th and 16th of October 1962, the defendant Backner testified under subpoena before the Federal Trade Commission in In The Matter of Universal-Rundle Corporation (F.T.C.Docket No. 8070). The Federal Trade Commission hearing as reflected in the transcript attached to the affidavit of Backner presents the facts upon which he relies. The Commission's concern, in the words of its hearing counsel, was " * * * to show that there are discriminations as between trade customers and also between the trade customers and Sears in price. And we have selected the Philadelphia-Camden area * * * as the area in which we propose to show these discriminations and the year 1957 has been selected * * * " (At page 3 of the transcript)

In 1962 Backner was called by the Federal Trade Commission. He was then Vice-President in charge of Marketing for the Universal-Rundle Company, in the same position as he had held in 1957. He testified to questions the Commission directed to him concerning the operations of Universal-Rundle Company in 1957 in the Philadelphia-Camden area. No other evidence was elicited as it may have related to Backner or Universal-Rundle as of any time other than 1957.

I have examined the transcript of the hearing before the Federal Trade Commission of 1962 in an endeavor to find any support for Backner's claim to immunity. In his brief, at pages 3 and 4 his counsel argues that Backner testified that he was a director of Universal-Rundle; that he was and had been Vice-President of Universal-Rundle in charge of marketing for thirteen years; that Universal-Rundle manufactured cast iron and vitreous china plumbing fixtures; that he, in his official position, had several departments—the sales department, advertising, sales promotion and new product development; that he had certain responsibility for the pricing of plumbing fixtures and approving special quotations to customers going into special projects; that such quotations were usually lower than list price and were brought in for review and okay; that his duties included responsibility for being familiar with the plumbing fixture market in general; that he kept abreast of the market in general; that he knew that all plumbing manufacturers made quotations for projects; that a certain percentage of cast iron fixtures and vitreous china materials were manufactured in this country by American Radiator & Standard Corporation, a competitor of his company; and that certain of the companies, who are now corporate defendants here, were competitors of Universal-Rundle.

▆ Assuming that all he presents is true, as reflected in the transcript of the Federal Trade Commission, his testimony was, except for his 1962 position, directed to the circumstances as they existed in 1957. Thus, what he was compelled to say before the Commission could not have been incriminating and as such entitling him to protections either under the Act of Congress or under the Fifth Amendment of the United States Constitution. From all that he says, what could he have refused to divulge on the ground of self-incrimination? As the supporting evidence is presented, I find no such factual circumstance. The present indictment is not based upon the 1957 position or activities of either Backner or the Universal-Rundle Corporation in the 1957 market place.

▆▆ Backner argues that § 9, nevertheless, immunizes him from prosecu-

---

vided, That no natural person so testifying shall be exempt from prosecution and punishment for perjury committed in so testifying. Sept. 26, 1914, c. 311, Section 9. 38 Stat. 722."

3. A photographic copy of this testimony is attached to and made a part of the affidavit.

tion for the 1962–1966 offense charged in the indictment because his compelled testimony before the Federal Trade Commission in 1962 is substantially related to the conspiracy charged in the present indictment and "could furnish a link in a chain of evidence against him, or furnish a lead that could uncover evidence incriminating him." Can Backner receive immunity under § 9 for offenses not yet committed at the time of the compelled testimony? Immunity statutes provide no protection against prosecution for unlawful activities engaged in subsequent to the compelled testimony. United States v. Smith, 206 F.2d 905, C.A. 3, 1953; United States v. Swift, 186 F. 1002 (D.C.Ill., 1911).

In *Swift*, supra, the Court stated 186 F. at page 1016:

> "Immunity does not mean license. If it does, then one need only to confess his crime, and his license to violate the law becomes perpetual. Any consideration of the so-called immunity or constitutional privilege which results in the giving of the license to continue an unlawful act, or immunity from prosecution for future crime, would be intolerable."

In *Smith*, supra, the defendant had been indicted in 1952 for evading income taxes for the calendar years 1945, 1946 and 1947. Appealing his conviction, the defendant argued that he had received immunity under 49 U.S.C. § 46 when he testified, pursuant to subpoena, in April 1946 before the O.P.A. The Court stated at page 907:

> " * * * The immunity granted by the Compulsory Testimony Act is co-extensive with the protection granted by the privilege against self-incrimination. Shapiro v. United States, 1948, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787; Heike v. United States, 1913, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450. Hence, the witness becomes immune only if he could have properly refused to testify because his answers would tend to incriminate him. We fail to see how any answer could tend to incriminate when the crime pres-

ently involved was not committed or perhaps even contemplated when the answer was given. United States v. Swift, D.C.N.D.Ill.1911, 86 F. 1002 * * *."

■ In enacting this particular immunity statute relating to the Federal Trade Commission activities, as divulged here, it is neither logical nor conceivable that Congress would have encouraged the commission of the very crimes in the future, which it sought to uncover. It grants immunity unquestionably to one who, while prejudicing or jeopardizing himself, aids in uncovering past or existing crime, but to say that it gives lifetime immunity for future violations would have to appear in the Congressional language. No such words appear. Courts cannot extend or project the words of a statute so as to grant license to one to act contrary to that which any statute prohibits.

This issue was again raised in this Circuit in 1962 in United States v. Johns-Mansville Corporation, 213 F. Supp. 65 (E.D.Pa., 1962). In that case the individual defendants sought dismissal of an indictment charging a Sherman Act conspiracy extending from 1954 to 1962 on the ground that they had testified concerning the same subject matter before a 1958 grand jury. Judge Van Dusen denied the motion to dismiss, citing United States v. Swift, supra, and noting also that *Swift* was cited with approval by the Third Circuit in the *Smith* case, supra. The Court specifically found that "immunity granted under a statute such as 15 U.S.C. § 32 does not grant a license to violate the law perpetually."

Judicial authority establishes that Backner is properly indicted for his continued participation in the crime charged herein subsequent to his Federal Trade Commission testimony. Were any other conclusion to be drawn, the result would provide the intention in the law to actually encourage individuals to continue to participate in illegal activities, because then, criminal liability could never attach. Mr. Justice Holmes, in Heike

v. United States, 227 U.S. 131, 142, 33 S.Ct. 226, 227, 57 L.Ed. 450 (1913), specifically stated that the antitrust immunity statute should not be construed to effect this result:

> "[T]he obvious purpose of the statute is to make evidence available and compulsory that otherwise could not be got. We see no reason for supposing that the act offered a gratuity to crime."

 As relates to the question of whether or not Backner has immunity only prior to October 16, 1962, the last date of his testifying, certainly even if the conspiracy related back to a time prior to that date, and Backner were indeed privileged, his recourse would be at the trial of the case, when the trial judge could properly provide for the evidence adduced and instruct the jury as to the admissibility or non-admissibility of the evidence so as to prevent the defendant being charged with the commission of crime for which Congress may have granted immunity for such immunized period. Since I have already found that his testimony in 1962 had no relevance to any period of time and subject matter for which he presently stands indicted, it does not appear that he has any claim here to immunity.

### John Balmer and Wallace-Murray Corporation

Wallace-Murray Corporation and John Balmer, its Executive Vice-President, defendants, here contend that the United States Government adduced evidence before the grand jury of certain confidential communications between them as members of the Plumbing Fixture Manufacturers Association, an unincorporated association, also a co-defendant and its attorney James C. McKay, and that McKay divulged these communications without the "clients" consent and in fact after the defendants had specifically refused to waive the attorney-client privilege.

Factually, it is not disputed that the corporate defendant was a member of the Plumbing Fixture Manufacturers Association. What then were the legal relationships of the individual corporate members and their officers with McKay, the Association's attorney?

It is admitted that the agreement of hire of McKay was by the Association as the Association's attorney. It is undisputed that none of the individual members acted in their own individual capacities, but rather by a majority control through the Association membership or the duly constituted Executive Committee. Between regular meetings of the Association, responsibility for the management of the Association at all times was in the hands of the Executive Committee under the Constitution of the Association which provided as follows:

> "The Executive Committee shall have full authority to conduct the affairs of the Association between meetings except as the Association may restrict this authority from time to time."

An affidavit of the attorney in question, James C. McKay, has been submitted here by the Government.* He describes his representation of the Association from 1955 through 1966. At meetings of the general membership in August 1963 and of the Executive Committee in November 1963, it had been determined that it was in the best interest of the Association to cooperate fully with all federal agencies investigating any matter, and McKay was instructed by the Association as its counsel to conduct himself accordingly.

On June 10, 1964, in response to a civil investigative demand calling upon the Association to submit to the Antitrust Division documents and information relating to the activities of the Association, and upon the instructions of the Executive Committee of the Association, McKay delivered numerous documents to the Antitrust Division. He was subpoenaed to appear as a witness before the grand jury in Pittsburgh on or about June 14, 1965. Following an inquiry of the Association on June 18,

---

* The defendants filed no counter-affidavits.

**614**

1965, the following telegram from the Association's Executive Vice-President was received:

"The Executive Committee of the Plumbing Fixtures Manufacturers Association has authorized me to advise you that it approves the waiver of the attorney-client privilege between the Association and its Counsel, Mr. James C. McKay of Covington & Burling, in connection with the Grand Jury Investigation in Pittsburgh, Pennsylvania."

On the previous day McKay had received a letter from the Secretary of Wallace-Murray Corporation that it did not concur in the waiving of the privilege. No communication was made by Balmer to McKay. We are not given factual information as to whether either of these two defendants was present at the Executive Committee meeting authorizing McKay to testify.

McKay testified before the grand jury on April 21, 1966. In his affidavit he deposes, inter alia,

"I believe that most and probably all of my testimony was unrelated to any confidential communication. To the best of my recollection my testimony concerning the various meetings of the Association was completely consistent with the information which the Association itself had previously authorized me to furnish the Department of Justice in the form of minutes and other documents in response to the Civil Investigative Demand. It is my present recollection that, apart from the opening statement quoted above, I made no mention of Wallace-Murray Corporation or any of its predecessors during any grand jury testimony. It is my present recollection that I made no mention of J. B. Balmer at any time during my testimony."

■ Specifically, did a client-attorney relationship exist between James McKay, counsel for the Association, on the one hand, and Wallace-Murray Corporation, a member of the Association and John Balmer, an officer of Wallace-Murray, on the other hand? In the case of Schwartz v. Broadcast Music, Inc., 16 F.R.D. 31 (D.C.N.Y., 1954), it was held that "each individual member of the [unincorporated] association is a client of the association's lawyer." From this we can say initially that Wallace-Murray Corporation, a member of the Association, was in a professional attorney-client relationship with the Association's attorney, McKay. In such a relationship, the attorney-client privilege would be applicable.

■ As to Balmer, an employee or officer of the Association member Wallace-Murray, no determination need here be made. The defendants have presented in their support the cases of Schwartz v. Broadcast Music, Inc., supra and Harkobusic v. General American Transportation Corp., 31 F.R.D. 264, 266 (W.D.Pa.1962). I am now assuming that under the *Schwartz* case, a right also existed in the corporation's officer, Balmer, as it existed in his employer Wallace-Murray. The question, however, remains as the evidence is here presented before me, what communications did these two defendants present which were privileged? Since the movants have not presented any evidence by which they could indicate to what specific communications they were referring, it is impossible to make any decision on what could be of a privileged character.

Accordingly, since the movants have presented no facts for which they lay claim to the attorney-clients privilege, as it relates to them and as it was evidence which McKay presented to the grand jury, I have nothing before me to support their motion on the ground of privilege. For this reason, also, the motion must be denied.

### *Robert J. Pierson, Jr.*

The defendant, Robert J. Pierson, Jr., submitted two motions for dismissal of the indictment. In the first he claims

immunity from prosecution pursuant to § 32 and § 33 of 15 U.S.C.[4]

From the affidavit of Pierson, submitted in support of his motions, and as supplemented by the argument and briefs, the following facts appear: On December 15, 1965, the grand jury investigating the alleged price-fixing in the plumbing fixture manufacturing industry issued a subpoena duces tecum addressed to the Rheem Manufacturing Company, of which Pierson was the Vice-President of Marketing in the Home Products Division. Paragraph 3 of the subpoena required the production of "all appointment books, desk calendars and diaries, wherever located for each of the following, for the period beginning on January 1, 1960 to the date of this subpoena: (a) R. J. Pierson." Under this paragraph the Rheem Manufacturing Company produced 36 appointment books, desk calendars and diaries used by Pierson in his official corporate capacity. The defendant claims that twelve of these documents contain personal notations and allegedly incriminating matter.

At the request of the corporation's counsel, the Government permitted the corporation to mail, in lieu of the personal appearance of and delivery by a corporate official, the documents to the Department of Justice, which procedure necessitated the execution of an affidavit by an officer of the corporation attesting to the corporation's compliance with the subpoena. The Department of Justice furnished a copy of a form affidavit of compliance, and defendant Pierson executed the affidavit of compliance in January, 1966 in his capacity as a corporation vice-president. The subpoena and affidavit of compliance referred to in the instant motion was one of several which were executed by the corporation. All the affidavits submitted by the corporation were sworn to by various officer-affiants who were designated in each case by the corporation and within the corporation's discretion. The defendant Pierson was advised by corporate counsel with respect to the corporation's response to the subpoena—to which he deposed—but he had no private or personal counsel.

 The procedure here followed was not the legal equivalent to the production of documentary evidence identified by the sworn testimony of a witness before the grand jury, which is the prerequisite of any immunity claim under § 32 and § 33. United States v. Fish Smokers Trade Council, Inc., 1956 Trade Cases, ¶ 68,414 (S.D.N.Y., 1956); United States v. Greater Kansas City Retail Coal Merchants Ass'n, 85 F.Supp. 503, 513 et seq. (W.D.Mo., 1949); United States v. Consumers Ice Co., 84 F.Supp. 46 (W.D.La., 1949).

 The execution by Vice-President Pierson for the corporation of the affidavit of compliance therefore did not bring him within the provisions of § 32 and § 33 and he is precluded from receiving personal immunity thereunder. In the *Fish Smokers Case,* supra, it is stated

"The statute granting immunity prescribes the conditions under which it may be gained—if a witness is subpoenaed, sworn and testifies he gains immunity, without expressly claiming it, as to those matters substantially connected with the transaction referred to in the indictment. United States v. Monia (1940–1943 Trade Cases ¶ 56,251), 317 U.S. 424. [63 S.Ct. 409, 87 L.Ed. 376]. Although Salzman produced the records under compulsion, of the subpoena served up-

---

4. The pertinent parts of § 32 and § 33 (15 U.S.C.) provide:
 "§ 32: No person shall be prosecuted or be subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may testify or produce evidence, documentary or otherwise, in any proceedings, suit, or

prosecution under section 1–7 of this title * * *."
"§ 33: Under the immunity provisions in section 32 of this title, immunity shall extend only to a natural person who, in obedience to a subpoena, gives testimony under oath or produces evidence, documentary or otherwise, under oath."

on the Union, he was under no compulsion to make the affidavit. The authority of the Attorney General extended only to require Salzman to appear before the Grand Jury; he could not by offering defendant a substitute procedure with respect to the documents bestow upon the defendant immunity claimed. Congress has prescribed the procedure for obtaining immunity and neither this court nor the prosecuting officer may prescribe other requirements. By voluntarily executing this affidavit under advice of counsel and in the latter's office, defendant waived his right to appear 'before the Grand Jury to authenticate and testify'; with it he waived his right to the protection of the statute as to the allegedly incriminating matter."

■■■■ Additionally, Pierson complains that the entries made by him were personal notations and as such were unavailable to the government as corporate records. The difficulty with Pierson's position here is that it was he who included these notations on corporate documents and it was he who, in his affidavit, swore that the "documents and records * * * furnished have been taken from the files of the company maintained in the regular course of its business." Furthermore, Pierson chose to use corporate records for making entries of his personal notations. While it is true that Pierson could act in a personal capacity during the time he was employed by the Rheem Corporation, he was also an administrative agent acting for and in behalf of the corporation. There is no evidence in any affidavit submitted before me that he was compelled to make personal notations on corporate records, but when he chose to do so, he could not thereby make the corporate records personal. They still remained corporate records. Such records may not by addition of personal notes of employees be made any the less available to the government under circumstances such as these. Ac-

cordingly, I find that the documents in question upon which Pierson made personal notations were and are corporate documents. The production of corporate documents by an individual while acting in a representative capacity neither violates his rights under the Fifth Amendment nor confers immunity upon him, even though the documents are personally incriminating. United States v. White, 322 U.S. 694, 699–700, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944); Wilson v. United States, 221 U.S. 361, 384–385, 31 S.Ct. 538, 55 L.Ed. 771 (1911); Hale v. Henkel, 201 U.S. 43, 74, 26 S.Ct. 370, 50 L.Ed. 652 (1906).

The second motion for dismissal presented by the defendant Pierson is premised upon the same facts as the first motion, namely, the production by the Rheem Corporation of the appointment books, desk calendars and diaries used by the defendant Pierson. The documents were produced in compliance with the subpoena duces tecum addressed to the corporation and were mailed to the Department of Justice with an accompanying affidavit of compliance prepared by defendant Pierson.

■■■ Pierson contends that he was compelled to incriminate himself in violation of his rights under the Fifth Amendment of the Constitution and that this occurred because he did not have available the advice of legal counsel respecting the implications of turning over the subpoenaed records. He supports his claim here on the holdings in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). This contention is not supported either by the facts of the case or the applicable law. Pierson, as an officer of the corporation and unlike the corporation itself, does have a constitutional privilege against self-incrimination. However, he does not come within the scope of either *Escobedo* or *Miranda,* supra.

The Supreme Court in *Miranda*, supra, indicated the scope of the protections provided:

At page 444, 86 S.Ct. at page 1612:

"Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

And at page 445, 86 S.Ct. at page 1612:

"The constitutional issue we decide in each of these cases is the admissibility of statements obtained from a defendant questioned while in custody or otherwise deprived of his freedom of action in any significant way. In each, the defendant was questioned by police officers, detectives, or a prosecuting attorney in a room in which he was cut off from the outside world. In none of these cases was the defendant given a full and effective warning of his rights at the outset of the interrogation process. In all the cases, the questioning elicited oral admissions, and in three of them, signed statements as well which were admitted at their trials. They all thus share salient features—incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights."

*Miranda* simply elaborates the protections not previously set out in *Escobedo*.

Pierson raises the inference that as an officer he was compelled to execute the affidavit and that by such compulsion he was in effect compelled by the Government to produce the documents required by the subpoena. Such a theory does not protect Pierson. United States v. White,

supra; Wilson v. United States, supra; Hale v. Henkel, supra. What is significant is that he was not compelled as a natural person to obey the subpoena and his disobedience of such subpoena directed to the Rheem Corporation was one for which he could not have been prosecuted or subjected to any penalty or forfeiture as provided in § 32. Neither was he personally compelled to execute any affidavit of compliance with the subpoena directed to the Rheem Corporation. That he did as an officer of the corporation. I find from the facts as presented here that the Government did not compel Pierson to produce any evidence nor to execute any affidavit of compliance.

Furthermore, in order to avail himself under the holding in *Miranda*, supra, it would have to appear that he was placed by the Government in a prejudicial position by which he was liable to lose his constitutional rights, particularly the right against self-incrimination. This does not appear in the evidence presented before me. I may presume that he, as a qualified businessman, relied upon corporate counsel and that his failure to consult private counsel certainly could not be attributable to anything that the Government had done.

The subpoena was addressed to Rheem Corporation. It was sufficiently specific to indicate the documents which were desired to be produced as they related to Pierson, and that Pierson executed the affidavit of compliance now appears to be incidental rather than a factor upon which he may rely as a support for the present motion. The Rheem Corporation was the actor here, and even if it had wrongfully deprived Pierson of these documents and presented them to the grand jury, Pierson would have had no claim to any right to a dismissal of the indictment because of such wrongfully presented evidence. Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). It cannot be anticipated that the corporation would have had in its possession any records of Pierson other than those which he maintained in his capacity for the corporation. Accordingly, the sub-

poena was properly directed to the corporation, and when the documents sought were forwarded by the corporation with an officer-affiant's supporting statement of compliance, they were corporate records.

Pierson also argues that the subpoena as addressed to the Rheem Corporation was a ruse on the part of the Government to induce him to give self-incriminating evidence. From the facts as presented, I cannot make any such finding. United States v. Owens Corning Fiberglass Corporation, 271 F.Supp. 561 (N.D.Cal.1967).

For the reasons herein set forth all the motions of the defendants will be denied.