INGRAM v. WESLEY et al. *

Circuit Court of Appeals, Fifth Circuit.
January 24, 1930.

No. 5528.

Charles A. Chandler and Eliot D. Turnage, both of Muskogee, Okl., Thomas S. Taliaferro, of Houston, Tex., and Bower Broaddus, of Muskogee, Okl. (C. A. Ambrister, of Muskogee, Okl., and Shelby Fitze, of Houston, Tex., on the brief), for appellant.

Pat N. Fahey, of Houston, Tex. (Boyles, Brown & Scott, of Houston, Tex., on the brief), for appellees.

Before WALKER and BRYAN, Circuit Judges, and DAWKINS, District Judge.

BRYAN, Circuit Judge. This was a suit in equity by Leonard D. Ingram to compel his attorneys, Wesley & Atkins, to account to him for alleged excessive fees which it was charged they induced him to pay by fraud, duress, and undue influence. In order to make the way clear for an accounting, the bill prayed for the annulment of certain releases which Ingram had executed to Wesley & Atkins, and of a judgment dismissing a suit brought by him against them and others in effecting a settlement, whereby Ingram acquired possession of his property from Wesley and others who theretofore had held the legal title as trustees under a deed of trust. The District Judge, after personally hearing the evidence, held that the charges of fraud, duress, and undue influence had not been sustained, and that, while the attorney's fees collected were excessive, Ingram had paid them freely and voluntarily, and for more than two years had acquiesced in the settlement; and he entered a final decree dismissing the bill for want of equity.

Ingram, the appellant, was born July 30, 1903. He is a negro, whose parents before emancipation were slaves of Creek Indians. As a new-born Creek freedman, he received an allotment of 160 acres of land in Creek county, Oklahoma, upon which oil was discovered. His father, and natural guardian, having died, his mother, Minerva, married a negro by the name of Charley Jones. In 1920 Jones and a white man named Wisdom were appointed guardians of his estate. A new county judge came into office in January, 1923, and an attorney named Alcorn filed application to have Wisdom and Jones removed and new guardians appointed. Jones and Wisdom resigned under Alcorn's threat of prosecution, according to some of the testimony, and new guardians were appointed. Ingram's mother, Minerva, was opposed to their appointment, and before it was made employed Wesley & Atkins, negro lawyers, to represent his estate. They advised her to have Ingram move his citizenship to some other state, or to the city of Washington, stating that by doing so she could have the Oklahoma guardians removed and others appointed, who lived at his new place of residence.

There was considerable testimony to the effect that the estates of Indians and Indian freedman, to whom had been allotted valuable land, during their minority or upon their incompetency being declared, were preyed upon by guardians and the attorneys representing them, and the District Judge stated in a written opinion that he believed this testimony to be true. In Bruner v. Cobb, 37 Okl. 228, 131 P. 165, 169, L. R. A. 1916D, 377, it is stated: "It seems to be a common practice in the part of the state from which this case comes for unscrupulous and designing men to prey upon the ignorant and defenseless, and in many instances the helpless Indians

*Rehearing denied March 7, 1930.

and freedmen." Minerva took the advice of Wesley & Atkins, and moved with Ingram and her other children, first to the city of Washington, and later to Maryland. Wesley & Atkins made an unsuccessful effort to have the latest Oklahoma guardians removed, and in the spring of 1924 Wesley took Ingram to Europe, to make sure that he would be beyond the jurisdiction of the county judge in Oklahoma. He brought him back to the United States a day or two before he reached his majority. On July 30, 1924, the day he became of age, Ingram executed a deed of trust by which he conveyed to his mother, Wesley, and A. P. Lewis all his property, which was variously estimated to be worth from $400,000 to $500,000. Lewis was Minerva's friend, and it appears that she selected him as one of the trustees.

Wesley & Atkins received from Ingram a fee of $15,000, for representing him and his estate up to that time. After that they defended several suits brought against him, and represented his estate generally, but their principal claim for further fees was based upon their services in placing and keeping the property in the hands of trustees who were satisfactory to Ingram, and in thus forestalling the appointment of guardians or trustees on the ground of Ingram's incompetence to manage his own affairs. In February, 1926, Alcorn again met Ingram and procured from him a deed of trust of all his property to the former's client, Capps, and immediately brought suit to set aside the deed of trust under which Wesley, Lewis, and Minerva Jones were acting as trustees. Wesley & Atkins represented the trustees in resisting this suit, and succeeded, at a meeting with Capps and Alcorn, in having it dismissed under a consent decree, which precluded the possibility of its being again brought. In doing this they were acting with the approval of Ingram, who claimed that, while he was in a drunken condition, he was persuaded by Alcorn to sign the deed to Capps.

Thereafter, on March 4, 1926, a settlement was had under the deed of trust of July 30, 1924, pursuant to which Wesley and the other trustees accounted for their handling of the property, and conveyed the title back to Ingram. Wesley & Atkins received as fees for their services and expenses, rendered after Ingram became of age, an amount found by the District Judge to be $41,000. Ingram was represented at the settlement by an attorney named Chandler, who advised him to agree to it. At the time he appeared to be well satisfied, and did not claim in his testimony that he was imposed upon, but testified at the trial that he thought the fees charged were excessive. It is admitted that the trustees correctly accounted for all moneys received by them in handling the trust. This suit was brought in October, 1928.

We accept the conclusion of the District Judge that the charges of fraud, duress, and undue influence were not sustained by the weight of the evidence. The findings of fact by a trial court, upon the weight of evidence and the credibility of witnesses who appeared personally before him, are to be accepted by the appellate court, except where they are clearly shown to be erroneous. It is a fair inference from the testimony that the advice of Wesley & Atkins that Ingram establish his citizenship in the District of Columbia, or in a state other than Oklahoma, was not given in furtherance of a fraudulent scheme, but was such advice as might well have been given by an honest lawyer, who was acquainted with conditions in Oklahoma affecting the administration of the estates of minors or incompetent adults. According to witnesses who were found by the District Judge to be worthy of belief, those conditions were about the same in 1923 as they were thought to be in 1913 by the Supreme Court of Oklahoma in Bruner v. Cobb, supra. It is apparent that Wesley & Atkins considered that they had rendered valuable service by keeping Ingram out of the reach of process from the county judge's court during his minority, and it may be that they saved him more than the $15,000 they charged him as a fee.

At any rate, upon reaching his majority, Ingram authorized payment of the fee, apparently of his own free will and accord. Ingram is not shown to have been under the influence of Wesley & Atkins at the time of the final settlement in 1926, when the larger fee of $41,000 was paid, after he had taken time for consideration and had received the advice of another attorney of his own selection, who thought that Ingram's opportunity to get rid of the suit brought by Alcorn for Capps and at the same time to get his property back in his own name was worth what it cost in fees. Ingram acquiesced in the settlement, and released his former attorneys and his trustees from liability, with full knowledge and appreciation of what he was doing. Moreover, after the settlement was made, he acquiesced in it for more than two years before he brought this suit. Under these circumstances, he is not in a position to invoke the aid of a court of equity to set at naught what he had done voluntarily, delib-

erately, and with full knowledge of all the facts. 12 C. J. 349; 12 R. C. L. 352.

The decree is affirmed.