**ROTHMAN et al. v. WILSON et al.**
No. 9595.

Circuit Court of Appeals, Ninth Circuit.
July 19, 1941.

John Lichty, of Portland, Or., for appellants.

Layton & Boyrie and Wm. C. Ralston, all of Portland, Or., for appellees.

Before GARRECHT and HEALY, Circuit Judges, and ST. SURE, District Judge.

GARRECHT, Circuit Judge.

In the fall of 1935 the receiver of the Prudential Savings & Loan Association (sometimes herein referred to as Prudential), an insolvent corporation, was offering for sale in the state of Oregon certain assets of the defunct corporation. The parties to this suit became interested in the purchase of these properties, which brought them into business relations with one another, out of which this litigation resulted.

The appellant Harry D. Rothman had been admitted to the bar in 1930. Up to the time of the trial he had little experience in legal work. He had never written a brief, never conducted a trial in court, and, during the nine years intervening between admission to practice and the time of trial, it was doubtful if he had had a dozen clients. Indeed, Mr. Kachlein testified that although he had talked with Rothman about employing him as attorney, he was well advised of Rothman's limitations in the field of law, and had no confidence in his legal ability.

Rothman, during the period mentioned, was engaged in the purchase and sale of

real estate and real estate contracts and in the purchase and sale of mortgages. He purchased the assets of defunct state and national banks and liquidated them. It is correct to say that he was principally engaged in these activities rather than in the law business, and this was well known to appellees' agents and representatives before the transactions hereafter discussed occurred.

The other individual appellant, Lloyd Raab, was president of Rainier Corporation, which acquired a controlling interest in the United States Life Insurance Company (hereinafter, for brevity, called States Life). Rothman had performed services of a financial character, and other than legal, for this company and was a close personal friend of Raab.

It is conceded that all the transactions between appellant and appellees here involved were handled on behalf of the appellees by John Sparling, a certified public accountant, who was the attorney in fact for John Wilson, appellee. He was an adviser of Mr. Raab in connection with the transaction whereby the Rainier Corporation acquired control of States Life. Later Mr. Sparling became secretary of this insurance company, and Mr. Raab the president.

George Kachlein, Jr., is an attorney at law practicing in Seattle. He was also connected with the deal by which the control of States Life was acquired by the Rainier Corporation, and for some years after this transaction held a majority of the stock of the said corporation. He held this stock as collateral for a loan which his grandmother had made to Rainier Corporation.

It was in connection with these deals of 1933 that Rothman first met Sparling and Kachlein. He met Mr. Wilson casually in the latter part of 1935.

The appellee Edna Burt Kachlein was not active in any of the matters concerned in this litigation other than through her son, attorney George Kachlein, Jr. She supplied twelve and one-half per cent of the money invested by John Wilson in the Prudential assets.

After Mr. Rothman learned that the remaining assets of Prudential were to be offered for sale by the Corporation Commissioner of the state of Oregon, he spent several months investigating their value and concluded that there was a possibility of making a considerable profit if a proper bid was accepted in the particular transaction. During this time Rothman approached Mr. Raab, then president of States Life, to ascertain if that company would be interested in making a bid for these assets. Rothman and Raab, over a period of three or four months, discussed the proposition and Raab conferred with Mr. Sparling about the matter, and it was agreed that if the deal was made and States Life was the successful bidder, Rothman was to handle the liquidation of the assets and was to receive therefor a twenty-five percent interest in the profits of the transaction.

About a week before the bids were to go in, Mr. Sparling and Mr. Raab conferred with the Deputy Insurance Commissioner of the State of Oregon relative to the propriety of the Union States Life Insurance Company bidding for the assets, and he discouraged the plan. The idea was therefore abandoned, and Mr. Sparling stated that he would have Mr. Kachlein come from Seattle and see if someone could be interested in bidding for the assets. Mr. Kachlein came, had a conference with Sparling, Raab, and Rothman, lasting most of one day, at the conclusion of which it was suggested that Sparling and Kachlein might be able to persuade Mr. John Wilson to make the bid. The bid would have to be made the following day, and Kachlein and Sparling left for Seattle, saw Wilson that night, and before morning they had decided to bid on the assets. Mr. Kachlein got in touch with someone in the law firm of Dey, Hampson & Nelson in Portland, Oregon, and arranged to have that firm put in the bid for him. The fact that they were going to bid was concealed from Rothman. The Wilson bid was successful, and it was approved and confirmed by the court on February 10, 1936.

Immediately following the confirmation of the sale Kachlein and Wilson came to Portland, and while there, went with Rothman to his office in the Failing Building. Rothman occupied an office having a reception room used jointly with John Lichty and Robert Clapperton, who were both practicing lawyers in Portland. Mr. Lichty had previously practiced law in Seattle, Washington, knew Kachlein, and was on very friendly terms with two or three members of the firm of Bogle, Bogle & Gates, of which firm Kachlein was a partner.

Mr. Lichty was called into Rothman's office and there introduced to John Wilson. After a short conversation, Kachlein asked

Lichty to step out of Rothman's office, and they went into the library. Mr. Kachlein told Lichty that there would be considerable legal work arising out of the liquidation of the Prudential assets, and that they would like to see Rothman benefit from the fees incidental to the legal work, and that if Lichty would agree to split fees with Rothman, they would engage him as their attorney. Mr. Lichty, at Kachlein's interrogation, had first explained to him that the arrangement between Rothman and himself was merely an officing arrangement, and that they were not interested together in the practice of law.

Mr. Kachlein testified that he did not have confidence in Mr. Rothman's legal ability; that he knew that he had not participated a great deal in legal activities, and that he told Lichty that he wanted him to supervise the legal work. In this connection Kachlein further said, "I told him [Lichty] that Mr. Wilson felt, and so did I, that we were reciprocating for the work Mr. Rothman had done in bringing to us this Prudential Savings & Loan bid, or opportunity for a bid." An arrangement was made for the payment of a retainer of $200 per month, which was paid for a period of five months. Of this amount Lichty received $500 and Rothman $500.

The first thing done of a legal nature was to draw up a power of attorney, which was duly executed by John Wilson, giving John Sparling full and complete power to deal with any and all of the properties here involved. Mr. Wilson testified that he left the entire management of affairs in Portland to Sparling. Mr. Sparling immediately opened up offices in the city of Portland for handling the liquidation of the Prudential properties, and employed H. A. Jones, an accountant, as the Portland manager. He was a certified public accountant, admitted to practice both in Washington and Oregon. Mr. Jones was employed at a conference in Seattle between Sparling, Wilson, and Jones; and Wilson testified that he told Jones at that conference that Mr. Sparling was to have entire charge of all the operations; that Jones was to work under Sparling and to take orders from no one, not even Wilson himself; that if he had any orders to issue, he would issue them through Sparling; that in matters of small importance he need not consult Sparling, but that he was not to put through any deal without Sparling's O. K.

Mr. Jones testified that about a week or ten days after the offices opened in Portland, George Kachlein, who was handling the legal work for Wilson in Seattle, came to Portland and told him that Mr. Rothman had been instrumental in getting the bid through for them and had done a lot of work, and that Mr. Lichty had agreed to do the legal work and split fees, but that he did not want any legal matters referred to Rothman, as he had no confidence in his legal ability; that he did not want Jones to accept Rothman's legal opinions. He further testified that from that time on he consulted Mr. Lichty exclusively relative to legal work for the Prudential syndicate; that the office which was opened in Portland was just down the hall from the office of States Life; that John Sparling came down to Portland quite often, and made his headquarters at the Benson Hotel, and whenever he was in town, Harry Rothman, John Sparling and Lloyd Raab were together most of the time.

The charge is that appellants defrauded appellees, and, in general, the method alleged to effectuate the purpose was for appellants to induce appellees to offer for sale or exchange, usually in groups, certain of the assets acquired by appellees from Prudential, and that Rothman would make an offer therefor. Often appellees desired to acquire a larger property for several smaller properties. It is alleged that the property offered in exchange to appellees was represented to be owned by persons other than appellants, while in fact the property so exchanged was owned by them or they had such an option on the premises as enabled them to control the title; that sometimes before the deal was consummated, appellants would have arranged to transfer the properties exchanged by appellees to third persons for an advanced price; that through such transactions and transfers appellants had made a considerable profit. Appellees based their right to recover upon the contention that the relation of attorney and client existed between them and Rothman, who conducted all transactions for appellants, and that by reason of this relationship Rothman was precluded by law from dealing with appellees to his own advantage without having made full disclosure of his connection with the transaction, which appellees alleged was not done.

Appellants admit that they dealt with the property to their gain but assert that it was

with the knowledge of appellees, whose agents and representatives were particularly informed that appellants were interested in the deals; further, that these agents of appellees, in their dealings with appellants relative to the properties, in no manner relied upon appellants but dealt with them at arm's length; that the values at which the properties were exchanged were fixed by an expert appraiser employed by appellees, who fixed the values without suggestion of appellants, and the action taken by appellees in exchanging properties was based upon the report and advice of their own expert appraiser.

It is admitted that attorney Lichty was employed by appellees; that he was not a partner of Rothman, but by agreement with appellees Lichty was to do the legal work, and by the direction of appellees Lichty was to divide any fees received by him with Rothman as compensation for work that Rothman had done in bringing the opportunity to bid on the Prudential assets to Wilson and Kachlein. Rothman received $500 as his one-half of the amount paid by appellees for professional services rendered by Lichty.

The evidence is convincing that appellees' agent Sparling did know, and furnishes some probability that Wilson supposed, that Rothman was personally interested in these dealings. The thing they did not know was the extent of the profit which accrued to appellants by reason of these transactions. When it was discovered that appellants had made a very considerable sum, this action was instituted.

The District Court found that Wilson, acting for appellees, had appointed Sparling as their attorney in fact and Jones as his assistant at Portland, Oregon; that otherwise neither of the "appellees", personally were consulted nor had anything to do with said Prudential properties. The court also found that appellees, Wilson and Kachlein, did not know that Rothman was making a personal profit out of these transactions, but further found that Sparling, appellees' attorney knew, or should have known, this fact.

The District Court made the following important conclusion of law: "That there was established between the defendant Rothman and the plaintiffs the relationship of attorney and clients, and such relationship continued throughout the times mentioned in the complaint; that by virtue of said relationship it was the duty of the de-

fendant Rothman to deal with the plaintiffs in the utmost good faith. It was his duty to reveal to the plaintiffs all matters relating to the plaintiffs' properties which were made the subject of his employment, and to advise the plaintiffs and deal in said properties solely for the plaintiffs' benefit, profit and advantage, and it was a violation of the duty owed by the defendant Rothman to the plaintiffs not to reveal and disclose to the plaintiffs that they might have had better agreements and trades with relationship to their properties than they had, and to convey to the plaintiffs all of the knowledge and information that he gained as to said properties throughout the course of his employment, and it was a violation of his duty to personally deal or trade in plaintiffs' properties to his own secret profit and advantage, without revealing that fact to its fullest extent, and it was a violation of that duty to have associated himself with the defendant Raab for the purpose of dealing and trading in plaintiffs' properties without revealing that fact to the plaintiffs."

Judgment was rendered against appellants, and they have appealed.

The question to be determined is, Did this tenuous relationship whereby Rothman in compensation for some past service rendered to appellees received $500, being one-half of the fees earned by Lichty for professional services rendered by Lichty and in which services, by express direction of appellees, Rothman was to have no part because appellees had no confidence in his legal experience or attainments, and which services so rendered had no connection with trading, exchanging, purchasing, or selling any of the Prudential assets, create, under the circumstances disclosed here, such a relationship of attorney and client as to preclude Rothman's dealing with these assets for his own gain?

There is no evidence to show that Mrs. Kachlein had any information as to the transactions here discussed. While Wilson testified that he did not know about any of the deals, the circumstance testified to for appellants, which was not contradicted, that concerning one of these trades Wilson expressed his gratification in having, as he thought, gotten the advantage over Rothman in the exchange, would lead to the conclusion that he might have had some intimation of what was transpiring. However, the District Court repeatedly found that appellees did not know that appellants

were dealing for themselves. The court also found that Rothman, having received part of the fees earned by his associate Lichty during the time he was dealing with appellees' property, was then their attorney, and notwithstanding the fact that by special direction of appellees he was not to render any legal services, Rothman was still subject to the disabilities inherent in the relationship of attorney and client.

Unquestionably, the law is that: "All such transactions or dealings are regarded with suspicion and disfavor, are discouraged by the policy of the law, and will be closely scrutinized by the courts which will lean against the attorney; * * *." 7 C.J.S., Attorney and Client, § 127, a, p. 964.

The strict rule applied in this case seems harsh. Rothman had spent months of time in accumulating information as to the potential value of the Prudential assets, which were to be sold upon competitive bid. It was agreed that if the States Life acquired this property, Rothman was to liquidate the assets and receive therefor twenty-five percent of the profits. When the State Insurance Department recommended against this plan, appellees were brought in through Kachlein and became the beneficiaries of Rothman's work, the value of which is apparent from the record in this case. Rothman, according to appellees, was to be compensated for this by sharing in the fees earned by Lichty. Rothman did not perform any legal services; indeed, appellees had no confidence in his legal ability; they insisted that no matters of a legal nature be submitted to him. As heretofore indicated, Rothman did not pretend to know a great deal of law. He testified that a few weeks after Kachlein had made the agreement with Lichty to do the legal work for appellees, he was told that they had no confidence in him as a lawyer and from that time on he did not regard himself as their attorney. It is probably correct to assume that he was unaware of the strictness of the rule of law whereby "Any transaction by which an attorney has taken a position, or acquired an interest, antagonistic to that of his client will be closely scrutinized by the courts; and may in many instances be avoided or invalidated irrespective of its merits, fairness, or good faith or whether or not it is in fact injurious to the client; * * *." 7 C.J.S., Attorney and Client, § 126, a, p. 960.

The record before us leads to the conclusion that these exchanges of properties between appellees and appellants worked out by Rothman resulted more profitably to appellees than would ordinarily have been realized by them from these Prudential assets if disposed of in any other way; also that if Rothman is compelled to turn over to appellees the profits he realized from his work and skill as a dealer and receive nothing for this special work, his activities outside the legal field will benefit appellees more than $48,000, for which no adequate remuneration has been made. The $500 which he did receive was, as stated by Kachlein, to reciprocate "for the work that Mr. Rothman had done in bringing to us this Prudential Savings & Loan bid."

The hardship in the application of the rule here from appellants' viewpoint lies in the fact that Wilson, who represented the appellees, gave to Sparling a full power of attorney, which reads in part as follows:

"Do hereby appoint John W. Sparling, as and for my attorney, for me and in my name, place and stead, to grant, bargain, sell, assign; transfer and convey unto any person whomsoever, any and all real property now owned by me, or hereafter acquired by me, * * * within the State of Oregon, and, generally, to act as my attorney, or agent within the State of Oregon, and the counties aforesaid, in relation to the premises, and all other matters in which I may be interested or concerned, and, on my behalf, to execute all such instruments, and to do all such acts and things, as fully and effectually, in all respects, as I, myself, could do if personally present * * *.

"Any person dealing with my said attorney, in connection with any of the powers herein granted to him, shall be exonerated from seeing to the application of any money paid to the said attorney, or for loss, or misapplication thereof, * * *."

Moreover, Wilson testified that at the time he employed Jones to be the resident manager in Portland, Oregon, he instructed him as follows: "* * * I told Mr. Jones it was my policy if I gave a man a job that I didn't interfere with him; I gave him instructions and I expected them to be carried out. I told Mr. Sparling that he was to be in entire charge of all operations, all business operations, and instructed Mr. Jones that he was [to] work under

Mr. Sparling; he was to take orders from no one, not even from me; if I had any orders to issue I would issue them through Mr. Sparling; and that I expected him to be manager in fact as well as in name, and he would have full control, so far as Portland was concerned, of all business operations. * * *"

In these circumstances appellants insist there was some excuse for not having these various trades or exchanges of property brought to the personal attention of appellees, who were residents of the state of Washington.

In our view this feature of the case makes it more difficult for appellants. They were dealing with Sparling, the representative and attorney in fact for appellees. Although he testified that he was unaware that Rothman in his dealings with the Prudential assets was acting in his own interest, the finding of the trial court that he knew this seems reasonable. It appears from the record that Wilson suspected that Sparling was in collusion with Rothman. Ordinarily, the duly constituted representative or attorney in fact occupies the place of the principal. But here these various transactions took place between Sparling and Rothman, both of whom were in fiduciary relationship with appellees. The appellants were aware of this status, which increased their burden of establishing facts satisfying the court that the dealings were at arm's length, or that the transactions were concluded in perfect good faith and were equitable and just. The trial court held that the evidence failed to establish these requisites. Where two persons both of whom occupy a fiduciary relation to a third person, and of which both have knowledge, enter into a transaction with each other whereby one of them, without the knowledge of the owner, acquires property of the third person to his own advantage and profit, such transaction is contrary to public policy and prima facie fraudulent. 7 C.J.S., Attorney and Client, § 127, p. 965.

There are cases which hold that the attorney's disability in this connection is absolute and such purchases have been characterized as void, but the weight of authority is to the effect that under proper circumstances such a purchase may be sustained "where the attorney can satisfactorily show that he has acted with his client's consent and that the transaction was in every way fair and not to the client's prejudice or disadvantage." 7 C.J.S., Attorney and Client, § 126, pp. 961, 962. As far as we have been able to ascertain, the supreme court of Oregon has not passed upon the exact question here presented. However, in the case of Dias v. Favell-Utley Realty Co., 126 Or. 227, 269 P. 207, the rule of law concerning the purchase of the property of his principal by an agent, was involved, and there the court said (at pages 231, 232 of 126 Or., at page 208 of 269 P.):

"It is a rule, and we think it has no exception, that an agent authorized to sell his principal's property may not, without the latter's consent, become the purchaser of it, and that if he does so the principal may repudiate the act and recover back his property, or if the agent has disposed of it at a profit the principal, if not guilty of laches, may compel an accounting for the profits. In such a case, says the author of 1 Mechem on Agency (2d Ed.) § 1198:

" 'The law looks at the natural and legitimate tendency of such transactions, and not at the motive of the agent in any given case. This tendency is demoralizing, and the fact that in a certain case the agent's motive was honorable, or that the result is more beneficial to the principal, will make no difference if the latter chooses to repudiate it.' "

And to the same effect was Franck v. Blazier, 66 Or. 377, 133 P. 800.

These cases from the Oregon court were cited by both parties to this appeal. While in neither case was the transaction between attorney and client, the question of agency was involved. The relation of attorney and client is one of agency and the general rules of law that apply to agencies apply. 7 C.J.S., Attorney and Client, § 67, p. 850.

The District Court found that appellees did not know that appellants were dealing with these Prudential assets to their own profit and advantage. The evidence was conflicting and we feel bound by the findings of the trial court. "Findings of the trial court, in a suit in equity, based on conflicting testimony, taken in open court, will not be disturbed on appeal." O'Brien, 1937 Cumulative Supplement to Manual of Federal Appellate Procedure, 2d Ed., p. 62. "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge

of the credibility of the witnesses." Rule 52 of Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Ingram v. Wesley et al., 5 Cir., 37 F.2d 201; United States v. Board of Nat'l Missions of Presbyterian Church, 10 Cir., 37 F.2d 272; Raines v. Ligon, 10 Cir., 37 F.2d 633; Ladd v. Perry, 7 Cir., 40 F.2d 265.

The general rule is against the attorney's acquisition of interests antagonistic to those of his client, and unless the client has knowledge thereof, and consents thereto, an attorney generally cannot make a valid purchase of an interest in his client's property. Had the trial been before this court in the first instance, we may have reached a different conclusion; but the circumstance of a double fiduciary relationship, together with the fact that on conflicting evidence the trial court found that appellees did not know that Rothman was dealing in this property to the advantage of appellants, constrains us to sustain the judgment of the District Court.

Affirmed.