580 F.2d 1311
 1978-2 Trade Cases 62,169
 WESTINGHOUSE ELECTRIC CORPORATION, Plaintiff-Appellee,
v.
KERR-McGEE CORPORATION, Noranda Mines Limited, Gulf Oil
Corporation, Gulf Minerals Canada Limited, and
Getty Oil Company, Defendants-Appellants.
 Nos. 78-1544, 78-1545, 78-1546 and 78-1547.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 12, 1978.
Decided July 25, 1978.
Rehearing and Rehearing En Banc Denied Aug. 17, 1978.
 
 Glenn W. McGee, Chadwell, Kayser, Ruggles, McGee & Hastings Ltd., Robert A. Creamer, Joseph S. Wright, Jr., Chicago, Ill., for defendants-appellants.
 Fred H. Bartlit, Jr., Kirkland & Ellis, Chicago, Ill., for plaintiff-appellee.
 Before FAIRCHILD, Chief Judge, and SPRECHER and BAUER, Circuit Judges.
 SPRECHER, Circuit Judge.
 
 
 1
 The novel issues on this appeal are (1) whether an attorney-client relationship arises only when both parties consent to its formation or can it also occur when the lay party submits confidential information to the law party with reasonable belief that the latter is acting as the former's attorney and (2) whether the size and geographical scope of a law firm exempt it from the ordinary ethical considerations applicable to lawyers generally.
 
 
 2
 The four separate appellants are some of the defendants in this antitrust case who were each denied their motions to disqualify the law firm of Kirkland and Ellis ("Kirkland") from further representing the plaintiff Westinghouse Electric Corporation ("Westinghouse"). Whether fortuitously or by design, on the same day, October 15, 1976, Kirkland, while representing the American Petroleum Institute ("API"), of which three of the appellants, Gulf Oil Corporation ("Gulf"),[1] Kerr-McGee Corporation ("Kerr-McGee") and Getty Oil Company ("Getty"), were members, released a report which took an affirmative position on the subject of competition in the uranium industry, while simultaneously filing this lawsuit, representing Westinghouse, seeking to establish an illegal conspiracy in restraint of trade in the uranium industry.
 
 
 3
 The fourth appellant, Noranda Mines Limited ("Noranda"), asserts a different conflict of interest in Kirkland resulting from its prior representation of Noranda from 1965 to 1967 in several matters.
 
 
 4
 The complaint in this case was filed on October 15, 1976 and the four appellants moved to disqualify Kirkland in January and February 1977. On April 18, 1978, the district court filed a lengthy memorandum followed by orders denying the disqualification motions. Westinghouse Electric Corp. v. Rio Algum Limited, 448 F.Supp. 1284 (N.D.Ill.1978). These appeals followed. This court has jurisdiction under Cohen v. Beneficial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). Schloetter v. Railoc of Indiana, Inc., 546 F.2d 706, 709 (7th Cir. 1976).
 
 
 5
 * On September 8, 1975, Westinghouse, a major manufacturer of nuclear reactors, notified utility companies that 17 of its long-term uranium supply contracts had become "commercially impracticable" under § 2-615 of the Uniform Commercial Code. In response, the affected utilities filed 13 federal actions, one state action, and three foreign actions against Westinghouse, alleging breach of contract and challenging Westinghouse's invocation of § 2-615. The federal actions were consolidated for trial in the Eastern District of Virginia at Richmond under MDL Docket No. 235.
 
 
 6
 As an outgrowth of its defense of these contract actions, Westinghouse on October 15, 1976, filed the present antitrust action against 12 foreign and 17 domestic corporations engaged in various aspects of the uranium industry.
 
 
 7
 Kirkland's representation of Westinghouse's uranium litigation has required the efforts of 8 to 14 of its attorneys and has generated some.$2.5 million in legal fees.
 
 
 8
 Contemporaneously with its Westinghouse representation in the uranium cases, Kirkland represented API, using six of its lawyers in that project.
 
 
 9
 In October, 1975, Congress was presented with legislative proposals to break up the oil companies, both vertically by separating their control over production, transportation, refining and marketing entities, and horizontally by prohibiting cross-ownership of alternative energy resources in addition to oil and gas. Since this proposed legislation threatened oil companies with a potential divestiture of millions of dollars of assets, in November, 1975, the API launched a Committee on Industrial Organization to lobby against the proposals. On December 10, 1975, API's president requested that each company designate one of its senior executives to facilitate coordination of the Committee's activities with the individual companies.
 
 
 10
 The Committee was organized into five task forces. The Legal Task Force was headed by L. Bates Lea, General Counsel of Standard Oil of Indiana, assisted by Stark Ritchie, API's General Counsel.
 
 
 11
 On February 25, 1976, Ritchie wrote to Frederick M. Rowe, a partner in Kirkland's Washington office, retaining the firm to review the divestiture hearings and "prepare arguments for use in opposition to this type of legislation." On May 4, 1976, Ritchie added that the Kirkland firm's work for API "should include the preparation of possible testimony, analyzing the probable legal consequences and antitrust considerations of the proposed legislation" and "you should make an objective survey and study of the probable effects of the pending legislation, specifically including probable effects on oil companies that would have to divest assets." Ritchie noted that "(a)s a part of this study, we will arrange for interviews by your firm with a cross-section of industry personnel." The May 4 letter to Rowe concluded with:
 
 
 12
 Your firm will, of course, act as an independent expert counsel and hold any company information learned through these interviews in strict confidence, not to be disclosed to any other company, or even to API, except in aggregated or such other form as will preclude identifying the source company with its data.
 
 
 13
 On May 25, 1976, Ritchie sent to 59 API member companies a survey questionnaire seeking data to be used by Kirkland in connection with its engagement by API. In the introductory memorandum to the questionnaire, Ritchie advised the 59 companies that Kirkland had "ascertained that certain types of data pertinent to the pending anti-diversification legislation are not now publicly available" and the API "would appreciate your help in providing this information to Kirkland. . . ." The memorandum included the following:
 
 
 14
 Kirkland, Ellis & Rowe is acting as an independent special counsel for API, and will hold any company information in strict confidence, Not to be disclosed to any other company, or even to API, except in aggregated or such other form as will preclude identifying the source company with its data.
 
 
 15
 (Emphasis in original). The data sought was to assist Kirkland "in preparing positions, arguments and testimony in opposition to this type of legislative (divestiture)" and was not to be sent to API but rather to Kirkland.
 
 
 16
 Pursuant to the provision in Ritchie's May 4, 1976 letter to Rowe that interviews would be arranged with a cross-section of industry personnel, Nolan Clark, a Kirkland partner, interviewed representatives of eight oil companies between April 29 and June 15, 1976.
 
 
 17
 After going through several drafts, the final Kirkland report to API was released on October 15, 1976. The final report contains 230 pages of text and 82 pages of exhibits. References to uranium appear throughout the report and uranium is the primary subject of about 25 pages of text and 11 pages of exhibits. The report marshalls a large number of facts and arguments to show that oil company diversification does not threaten overall energy competition. In particular the report asserts that the relatively high concentration ratios in the uranium industry can be expected to decline, that current increases in uranium prices are a result of increasing demand, that oil company entry into uranium production has stimulated competition and diminished concentration, that oil companies have no incentive to act in concert to restrict coal or uranium production and that the historical record refutes any charge that oil companies have restricted uranium output. The report concludes that "the energy industries, both individually and collectively, are competitive today and are likely to remain so." 448 F.Supp. at 1296.
 
 
 18
 As noted at the outset of this opinion, the API report was issued on the same day as the present antitrust suit was filed against several defendants, including Gulf, Kerr-McGee and Getty.
 
 
 19
 The district court concluded that "(a) comparison of the two documents reveals a rather basic conflict in their contentions and underlying theories." 448 F.Supp. at 1295. The court also observed that "(p)erhaps in recognition of the diametrically opposing theories of the API report and the Westinghouse complaint, Kirkland does not attempt to rebut the oil companies' charges that it has simultaneously taken inconsistent positions on competition in the uranium industry." 448 F.Supp. at 1296.
 
 
 20
 Gulf, Kerr-McGee and Getty are substantial dues-paying members of API. Kerr-McGee and Getty are also represented on API's board of directors.
 
 
 21
 At Ritchie's request, the cross-section interviews were mainly arranged by Gerald Thurmond, Washington Counsel of Gulf Oil Company and a member of API's Antitrust Strategy Group. On May 11, 1976, Thurmond advised Gulf officials that Nolan Clark of Kirkland planned to visit them. Attached to Thurmond's letter were the questions "which will be covered" in the meeting.[2]
 
 
 22
 The meeting was held on May 28, 1976 in Denver. Nolan Clark represented Kirkland. In attendance for Gulf were six vice presidents, a comptroller and a regional attorney. Also present was a Harvard professor who "also is working with API on the same subject." The meeting lasted more than two hours followed by lunch, during which discussions continued. After the meeting and in three letters from Gulf vice president Mingee to Clark dated August 10, 11 and 13, Gulf submitted specific information sought by Clark through the questionnaire and other written questions and in each letter Mingee stressed the confidential basis upon which the information was supplied.
 
 
 23
 Nolan Clark's interview with two Kerr-McGee vice presidents took place in Oklahoma City on June 9, 1976 and lasted about three hours. Clark was given considerable background information on Kerr-McGee's uranium industry, including mining locations, uranium conversion process, and pellet fabrication. On the subject of uranium marketing and pricing, one of the Kerr-McGee vice presidents described the escalating prices and tightening supplies in the current market, and the reasons behind the trends. Kerr-McGee sent its completed questionnaire to Clark on August 25, 1976.
 
 
 24
 Kirkland did not interview any Getty personnel. However, Getty received the confidential API questionnaire which requested it to estimate the value of its assets subject to proposed divestiture and its research and development outlays in alternative energy fields. Getty completed the questionnaire and mailed its data sheets to Nolan Clark on June 4, 1976, with the understanding that the data would be held in confidence.[3]
 
 II
 
 25
 The crux of the district court's determination was based upon its view that an "attorney-client relationship is one of agency to which the general rules of agency apply" and "arises Only when the parties have given their consent, either express or implied, to its formation." 448 F.Supp. at 1300 (emphasis supplied). Although some courts have stated that the attorney-client relation is one of agency and that the general rules of law applicable to agencies apply,[4] in none of those cases was an agency principle applied to assist an attorney to avoid what would otherwise be an obligation to his client.[5] Only one court seems to have added that an attorney-client relationship arises Only when the parties have expressly or impliedly consented to its formation. Committee on Professional Ethics and Grievances v. Johnson, 447 F.2d 169, 174 (3d Cir. 1971). In that case, the court reversed and remanded a disbarment case on the ground of lack of adequate notice of the charges and declined to pass upon the merits. 447 F.2d at 174, n.8.
 
 
 26
 Of course in many respects and situations an attorney acts as a simple agent for the client, but the attorney is held to obligations to the client which go far beyond those of an agent and beyond the principles of agency, just as they transcend the legal bounds of an arms-length commercial transaction. Mr. Chief Justice (then Judge) Burger said in Udall v. Littell, 125 U.S.App.D.C. 89, 96, 366 F.2d 668, 675, 676 (1966), Cert. denied, 385 U.S. 1007, 87 S.Ct. 713, 17 L.Ed.2d 545 (1967):
 
 
 27
 (A)n attorney engaged in controversy with a client in relation to a contract for professional services is in some respects in a different posture from an ordinary litigant involved in an arms length commercial transaction; as an attorney he is bound to the highest duty of fidelity, honor, fair dealing and full disclosure to a client.
 
 
 28
 The basic elements of the attorney-client relationship are not changed because the contract for services is expressed in a formal written contract. Indeed the very making of a formal contract and its performance impose a high duty on the attorney because he is dealing in an area in which he is expert and the client is not and as to which the client must necessarily rely on the attorney. . . . This is not to suggest that a formal contract is unimportant but rather that a formal long-term contract, superimposed on the normal attorney-client relationship, alters the relationship only by adding new dimensions of duties and obligations on the attorney.
 
 
 29
 For these reasons it is obvious why an attorney-client relationship does not arise only in the agency manner such as when the parties expressly or impliedly consent to its formation as the district court erroneously concluded.
 
 
 30
 The district court first determined that there existed no explicit or express attorney-client relationship in that no oil company representative requested Kirkland to act as its attorney orally or in writing and Kirkland did not accept such employment orally or in writing. The district court found that "Kirkland sent its legal bills to the API, and was compensated only by the API." 448 F.Supp. at 1301. A professional relationship is not dependent upon the payment of fees[6] nor, as we have noted, upon the execution of a formal contract.[7]
 
 
 31
 The court then purported to determine whether the professional relationship "may be implied from the conduct of the parties." First, it found no "indicia" such as "the preparation of a legally-binding document like a contract or a will, or the attorney's appearance in a judicial or quasi-judicial proceeding." 448 F.Supp. at 1301. Second, the court searched for evidence of three fundamental characteristics of an agency relationship: the power to affect the legal relations of the principal and others; a fiduciary who works on behalf of his principal and primarily for his benefit; and a principal who has the right to control the conduct of the agent. 448 F.Supp. at 1301-03. Using these tests, the court concluded that "(v)iewed in its totality, we believe that the evidence shows that no attorney-client relationship has existed between Kirkland and the oil companies." As we have indicated, to apply only the agency tests is too narrow an approach for determining whether a lawyer's fiduciary obligation has arisen.
 
 
 32
 The district court also erroneously permitted itself to be influenced by the size of the law firm involved. In addition to identifying Kirkland as one of the largest law firms in Chicago with a two-city operation including 130 lawyers in the Chicago office and 40 lawyers in the Washington, D. C. office, the court observed that "(w)ith the modern-day proliferation of large law firms representing multi-billion dollar corporations in all segments of the economy and the governmental process, it is becoming increasingly difficult to insist upon absolute fidelity to rules prohibiting attorneys from representing overlapping legal interests." 448 F.Supp. at 1287-88.
 
 
 33
 Although the court recognized that "where courts have found a disclosure of client information to one member of a law firm, such knowledge has traditionally been imputed to all members of his firm," it opted in this case to reject "this rigid approach, in recognition of the changing realities of modern legal practice." 448 F.Supp. at 1304.
 
 
 34
 The district court abused its discretion in applying a narrow, formal agency approach to determining the attorney-client relation and in applying a different imputation of knowledge principle in the case of a large law firm than that "traditionally" and recently applied by this circuit to sole practitioners and smaller firms. Schloetter v. Railoc of Indiana, Inc., 456 F.2d 706, 710 (7th Cir. 1976).
 
 III
 
 35
 The client is no longer simply the person who walks into a law office.[8] A lawyer employed by a corporation represents the entity[9] but that principle does not of itself solve the potential conflicts existing between the entity and its individual participants.[10]
 
 
 36
 Three district courts have held that each individual member of an Unincorporated association is a client of the association's lawyer.[11] In Halverson v. Convenient Food Mart, Inc., 458 F.2d 927, 930 (7th Cir. 1972), we held that a lawyer who had represented an informal group of 75 franchisees "(b)ecause . . . (he) in effect had represented and benefited every franchisee, . . . could reasonably believe that each one of them was his client."
 
 
 37
 Here we are faced with neither an ordinary commercial corporation nor with an informal or unincorporated association, but instead with a nation-wide trade association with 350 corporate and 7,500 individual members (448 F.Supp. at 1290) and doing business as a non-profit corporation.
 
 
 38
 We need not make any generalized pronouncements of whether an attorney for such an organization represents every member because this case can and should be decided on a much more narrow ground.
 
 
 39
 There are several fairly common situations where, although there is no express attorney-client relationship, there exists nevertheless a fiduciary obligation or an implied professional relation:
 
 
 40
 (1) The fiduciary relationship existing between lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer, although actual employment does not result.[12]
 
 
 41
 (2) When information is exchanged between co-defendants and their attorneys in a criminal case, an attorney who is the recipient of such information breaches his fiduciary duty if he later, in his representation of another client, is able to use this information to the detriment of one of the co-defendants, even though that co-defendant is not the one which he represented in the criminal case. Wilson P. Abraham Const. Corp. v. Armco Steel Corp., 559 F.2d 250 (5th Cir. 1977) (disqualification case).
 
 
 42
 (3) When an insurer retains an attorney to investigate the circumstances of a claim and the insured, pursuant to a cooperation clause in the policy, cooperates with the attorney, the attorney may not thereafter represent a third party suing the insured nor indeed continue to represent the insurer once a conflict of interest surfaces.[13]
 
 
 43
 (4) In a recent case, where an auditor's regional counsel was instrumental in hiring a second law firm to represent some plaintiffs suing the auditor and where the second firm through such relationship was in a position to receive privileged information, the second law firm, although having no direct attorney-client relationship with the auditor, was disqualified from representing the plaintiffs. Fund of Funds, Ltd. v. Arthur Andersen & Co., 567 F.2d 225 (2d Cir. 1977).
 
 
 44
 (5) In a recent case in this circuit, a law firm who represented for many years both the plaintiff in an action and also a corporation which owned 20% Of the outstanding stock of the defendant corporation, was permitted to continue its representation of the plaintiff but was directed to disassociate itself from representing or advising the corporation owning 20% Of defendant's stock. Whiting Corp. v. White Machinery Corp., 567 F.2d 713 (7th Cir. 1977).
 
 
 45
 In none of the above categories or situations did the disqualified or disadvantaged lawyer or law firm actually represent the "client" in the sense of a formal or even express attorney-client relation. In each of those categories either an implied relation was found or at least the lawyer was found to owe a fiduciary obligation to the laymen.
 
 
 46
 The professional relationship for purposes of the privilege for attorney-client communications "hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice."[14] The affidavits before the district court established that: the Washington counsel for Gulf "was given to believe that the Kirkland firm was representing both API and Gulf;"[15] Kerr-McGee's vice president understood a Kirkland partner to explain that Kirkland was working on behalf of API and also its members such as Kerr-McGee;[16] and Getty's vice president stated that in submitting data to Kirkland he "acted upon the belief and expectation that such submission was made in order to enable (Kirkland) to render legal service to Getty in furtherance of Getty's interests."[17]
 
 
 47
 A fiduciary relationship may result because of the nature of the work performed and the circumstances under which confidential information is divulged.[18] The Supreme Court approved and transmitted to Congress in 1972 the Federal Rules of Evidence,[19] which included among the lawyer-client privilege rules eventually eliminated by Congress, the following definition:[20]
 
 
 48
 A "client" is a person, public officer, or corporation, association, or other organization or entity, either public or private, who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from him.
 
 
 49
 The professional relationship does not arise where one consults an attorney in a capacity other than as an attorney.[21] The district court said that the Kirkland "firm's involvement was that of an expert consultant and researcher." 448 F.Supp. at 1301. The questionnaire sent to 59 oil company members of API represented to the recipients that the Kirkland firm "is acting as an independent special counsel for API."[22] The API letter employing Kirkland expressly said that "(y)our firm will, of course, act as an independent expert counsel."[23] The lobbying-type functions undertaken by Kirkland in this case are not foreign to lawyers and in fact are a common undertaking by Washington, D. C., lawyers. In soliciting confidences from API members, Kirkland did not disavow its capacity as attorneys but came expressly represented as lawyers.
 
 
 50
 The district court concluded that "the transmission by the oil companies of confidential information on their uranium industries and assets has given rise to justifiable fears that their disclosures will return to haunt them in the present litigation" and "(t)he acquired information appears to be closely related to the subject matter of the Westinghouse complaint." 448 F.Supp. at 1304. The court did not find violations of Canons 4[24] or 5[25] because it could not find an attorney-client relationship on the basis of the narrow agency rules applied. However the court did find a Canon 9[26] violation, but did not believe that such a violation alone should result in disqualification "especially in a case of the present complexity and magnitude" involving a two-city large law firm which had attempted to segregate the substantial number of lawyers working on each matter.
 
 
 51
 The lower court perceived that "an attorney should be disqualified under Canon 9 only when 'there is a reasonable possibility of improper professional conduct' and 'the likelihood of public suspicion or obloquy outweighs the social interests which will be served by a lawyer's continued participation in a particular case.' " 448 F.Supp. at 1304.
 
 
 52
 Although Kirkland asserted, and the district court agreed, that it constructed a "Chinese wall" between the 8 to 14 Chicago-based attorneys working for Westinghouse and the 6 D.C.-based attorneys working for API, both conceded that William Jentes, one of Kirkland's lead attorneys working on the Westinghouse antitrust complaint, in August 1976 agreed with API task force head Lea, to prepare a legal memorandum analyzing arguments which had been advanced to broaden the scope of existing antitrust laws to outlaw interlocking directorates. Lea forwarded the Kirkland memorandum to the API, which mailed it to its member-company contact officers on September 23, 1976. Despite this breach of the "wall," we do not recognize the wall theory as modifying the presumption that actual knowledge of one or more lawyers in a firm is imputed to each member of that firm.[27] Here there exists a very reasonable possibility of improper professional conduct despite all efforts to segregate the two sizeable groups of lawyers.[28]
 
 
 53
 Kirkland has argued that the oil companies were aware that Kirkland was representing Westinghouse while it was also representing API, inasmuch as Kirkland sought discovery from Kerr-McGee, Getty and abortively from Gulf, relating to the Richmond litigation, in the way of voluntary interviews, depositions and the production of documents. The point, however, is not that the oil companies were aware that Kirkland represented Westinghouse but whether the oil companies were aware that such representation would lead to Kirkland representing Westinghouse in a lawsuit in which the oil companies would be defendants. As the district court noted, "none of the (Kirkland) Washington attorneys working on the API divestiture assignment knew of the separate Westinghouse antitrust complaint until it was filed in court on October 15 (1976), after the stock exchanges closed on that day." 448 F.Supp. at 1296. If some of Kirkland's own partners were not aware of the Westinghouse antitrust complaint until it was filed, the oil companies can scarcely be presumed to have greater knowledge that it was impending with themselves as some of the defendants. It was Kirkland's duty to keep the oil companies advised of actual or potential conflicts of interest, not the oil companies' burden to divine those conflicts.
 
 
 54
 Gulf, Kerr-McGee and Getty each entertained a reasonable belief that it was submitting confidential information regarding its involvement in the uranium industry to a law firm which had solicited the information upon a representation that the firm was acting in the undivided interest of each company. Canons 4 and 5, as well as Canon 9, apply. If Kirkland's size and multi-city status had any effect, it was in the direction of encouraging the oil companies to divulge confidential information. Whereas they might show reluctance to entrust their substantial assets and future fortunes to a sole practitioner or small law firm, Kirkland's substance and reputation would tend to comfort any apprehensions and open the lines of communication. In any event, there is no basis for creating separate disqualification rules for large firms even though the burden of complying with ethical considerations will naturally fall more heavily upon their shoulders.
 
 
 55
 The fact that the two contrary undertakings by Kirkland occurred contemporaneously, with each involving substantial stakes and substantially related to the other, outbalances the client's interest in continuing with its chosen attorney. However, we believe that Westinghouse should have the option and choice of dismissing Gulf, Kerr-McGee and Getty from the antitrust case or discharging Kirkland as its attorney in the case. Substitute counsel has represented Westinghouse in the case since February 17, 1978, so that the impact of any change-over has been somewhat eased.
 
 IV
 
 56
 The Noranda motion to disqualify Kirkland was based on an entirely different set of circumstances.
 
 
 57
 Noranda is a Canadian corporation organized under the laws of the Province of Ontario, having its principal place of business in Toronto. In 1965, Kirkland represented Noranda in the formation of a joint venture with Central Farmers Fertilizer Company, a domestic corporation centered in Chicago, Illinois. By that agreement, Noranda and Central formed a Canadian corporation to mine potash in Canada. The only possible nexus between the Central transaction and the present litigation is Noranda's belief that Kirkland may have learned the name of one of its executives, D. E. G. Schmitt, whose deposition was scheduled. The district court, finding that "(e)ven Noranda admits that Kirkland has alternate public sources of information for Schmitt's identity," found no substantial relationship between the character of a potash joint venture and a uranium price-fixing conspiracy, 448 F.Supp. at 1308.
 
 
 58
 In 1967, Kirkland, working in conjunction with Noranda's general counsel in Toronto, advised Noranda on the impact of United States' antitrust, corporation, securities and tax laws on a proposed exchange offer involved in Noranda's abortive effort to acquire control of Essex Wire Corporation. The mechanics of the exchange required the formation of a Delaware subsidiary of the Canadian parent corporation. Kirkland organized the American subsidiary, which included the naming of three Kirkland attorneys as incorporators, the holding of the first meeting, and the election of directors. Three Kirkland attorneys studied the antitrust issues which culminated in the preparation of a "Fact Book," which analyzed the competitive impact of the prospective acquisition. Both Noranda and Essex sold copper cable and wire in the United States and Noranda was to become the supplier of Essex's considerable copper requirements.
 
 
 59
 The tender offer was aborted and on August 1, 1967, Kirkland returned to Noranda all of its personal material. Kirkland simultaneously destroyed the longhand notes of its attorneys who viewed corporate data. Kirkland has not represented Noranda on any matter since 1967.
 
 
 60
 Noranda contended that Kirkland gained access in 1965-1967 to its relationship to Noranda Sales Corporation, Ltd. and Kerr-Addison Mines Limited, the first of which tied Noranda into doing business in Illinois and the second of which is involved in the uranium industry. After an exhaustive study of the affidavits and material submitted, 448 F.Supp. at 1306-10, the district court found no substantial relationship between Kirkland's earlier representation relating to the copper industry and the presently-alleged uranium price-fixing conspiracy which did not begin until 1972. The court concluded that "the Westinghouse complaint concerns a completely different industry and a completely different time." Noranda's relation to Noranda Sales and Kerr-Addison appears in publicly-available documents, such as Noranda's annual reports and Dun and Bradstreet reports.
 
 
 61
 We do not believe that the district court abused its discretion in concluding that the more than 10-year past representations for two specific matters unrelated to the present case did not warrant disqualification of Kirkland. Schloetter v. Railoc of Indiana, Inc., 546 F.2d 706 (7th Cir. 1976).
 
 
 62
 Judgment in Appeal No. 78-1545 is affirmed; judgments in Nos. 78-1544, 78-1546 and 78-1547 are reversed and remanded.[29]
 
 
 63
 Affirmed in part; Reversed and Remanded in part.
 
 
 
 [1]
 Gulf Minerals Canada Limited is also a defendant but for convenience hereafter is included with Gulf Oil Corporation as "Gulf."
 
 
 [2]
 The questions were prepared by Nolan Clark as "the kinds of questions I might want to ask":
 In which alternative energy businesses is your company engaged? How, when, and why did your company enter these businesses?
 What assets would your company have to divest in order to get out of alternate energy businesses?
 Of the affected assets, could some be divested in the form of independent operating entities? Which? Could other affected assets be sold to other presently existing entities? Which? Are you in some alternate energy businesses which could not be sold, but rather would have to be liquidated? If so, what would your estimate losses be?
 Would your divestiture of alternative energy businesses violate any contractual provisions of your loan or debenture agreements? Other contractual arrangements? If so, which? Would you anticipate any serious problems in renegotiating contractual provisions? If so, what kind of problems?
 Would you anticipate any problems of disposing of alternative energy assets? If so, what kind of problems? Are your leaseholds assignable? Would you have to sever coal & uranium mineral rights from other mineral rights? Would this cause any significant problems?
 Would you anticipate any problem in receiving a fair market price for assets to be divested? If so, what kind of problems and why?
 The statement has been made that oil and gas companies can easily divest alternate energy businesses by "spinning off" companies with those assets. Is this statement accurate?
 What specific problems do you foresee arising by the possible passage of horizontal divestiture legislation? short-term? long-term?
 Who if anyone would you expect to be affected adversely by horizontal divestiture? How and why?
 How do the problems of divestiture compare under the following scenarios: (1) the company has a given number of years to get out of alternate energy businesses subject to criminal sanctions, and (2) the company would be required to get out of alternate energy businesses in accordance with judgments entered in civil actions to be brought by Attorney General?
 What effect do you think passage of a horizontal divestiture bill would have on your long and short term investment plans?
 Do you expect that passage of horizontal divestiture legislation would affect your ability to raise capital?
 Are your non-oil and gas energy assets managed separately from oil and gas assets? What overlaps are there between them?
 Have you found that your oil and gas expertise and resources have been of any particular value as you have developed alternate energy sources? If yes, how?
 Do petroleum companies have specific assets that are uniquely valuable to alternative energy sources?
 Do you expect the same rate of return for oil drilling, coal production, uranium exploration?
 If an oil company owns alternative fuel possibilities, would you reasonably expect a coal division of that company to try to undersell the oil division on a BTU equivalent basis, or nuclear division to do the same thing?
 Do you attempt to sell oil, natural gas, coal and uranium at BTU equivalent prices? If so, why? If not, why not? Over the long run do you expect alternative energy sources to have BTU equivalent prices? Are long-run investments made, based upon this expectation?
 Will oil companies with substantial interests in oil production be reluctant to develop low cost alternative sources of energy, E. g., oil shale?
 Are you presently developing coal reserves, uranium reserves? At what rate? If you do not presently plan to develop certain reserves within the near future, why not?
 Do you know of any oil or gas companies that have lower cost alternate sources of energy that they are not developing? Under what economic conditions do you think it would make sense for an oil or gas company to acquire and not develop alternate energy sources?
 With respect to coal as a synthetic fuel source, is there any fundamental economic reason why a completely new synthetic fuel industry should not develop, separate from conventional fuel industries?
 When do you expect commercially feasible coal liquefaction? Coal gasification? Production of oil from oil shale? From tar sands? What magnitude of capital investments do you anticipate will be required in these various areas to reach the stage of commercial development?
 Have the oil companies blocked coal liquefaction research?
 If coal becomes a major source of methane-based pipeline gas, what would be the consequences on the coal market if integrated petroleum companies are both buyers and sellers of gas and coal?
 Where are the benefits from the entry of oil companies into coal?
 Have oil companies increased their holdings of coal reserves faster than they have increased coal production? Are the oil companies cementing their control over future, not current, production through coal reserve ownership?
 Do oil companies control the most producible and most economical coal reserves?
 Is the oil industry aiding coal production?
 Is entry into the coal industry difficult because of the shortage of skilled miners and skilled mine managers?
 How easy or difficult is entry into the uranium mining and uranium milling businesses?
 Is the uranium industry competitive? Is that industry becoming more or less competitive? What evidence could you give to support your answer?
 What are the benefits from the entry of oil companies into uranium mining? Into uranium milling?
 Are the oil companies aiding uranium production?
 Do oil companies control the most producible and most economical uranium reserves?
 Have oil companies increased their holdings of uranium reserves faster than they have increased uranium production?
 
 
 [3]
 Nolan Clark had "come to the conclusion that certain information was not then available from publicly available sources" so the following questions were sent to 59 companies, including Gulf, Kerr-McGee and Getty:
 I. If it became law, would S.489 apply to your company?
 II. If S.489 were to become law, what would be your best good faith estimate of the $$ value of the assets that you would have to divest, in the:
 (a) coal business
 (b) oil shale business
 (c)(1) production, mining & milling of uranium
 (2) nuclear fuel cycle
 (d) nuclear fuel cycle
 (e) geothermal steam business
 (f) solar energy business
 (g) other
 III. Approximately how much has your company spent in the last year, the last five years, and the last ten years for research and development in connection with:
 (a) mining of coal
 (b) gasification of coal
 (c) liquefaction of coal
 (d) development of oil shale
 (e) development of tar sands
 (f) (1) exploration, mining & milling of uranium
 (2) nuclear fuel cycle
 (g) nuclear reactors
 (h) exploration, mining, or production of geothermal steam,
 (i) solar energy.
 IV. What are your company's last good faith estimates of planned or projected research and development outlays for the next five years, and for the next ten years, in connection with:
 (a) mining of coal
 (b) gasification of coal
 (c) liquefaction of coal
 (d) development of oil shale
 (e) development of tar sands
 (f)(1) exploration, mining & milling of uranium
 (2) nuclear fuel cycle
 (g) nuclear reactors
 (h) exploration, mining, or production of geothermal steam
 (i) solar energy.
 
 
 [4]
 Rothman v. Wilson, 121 F.2d 1000, 1006 (9th Cir. 1941); Hensley v. United States, 108 U.S.App.D.C. 242, 248, 281 F.2d 605, 607 (1960); Brinkley v. Farmers Elevator Mut. Ins. Co., 485 F.2d 1283, 1286 (10th Cir. 1973)
 
 
 [5]
 In Rothman, the court of appeals affirmed a judgment in favor of clients against an attorney for fraud in obtaining secret profits in business transactions; in Hensley, the court held that an attorney can waive a jury trial on behalf of his client as a tactical decision; in Brinkley, the court held that a client was not liable under the doctrine of Respondeat superior for the tortious conduct of his attorney which caused injury to a third party
 
 
 [6]
 Allman v. Winkelman, 106 F.2d 663, 665 (9th Cir. 1939), Cert. denied, 309 U.S. 668, 60 S.Ct. 608, 84 L.Ed. 1014 (1940) ("lawyer's advice to his client establishes a professional relationship though it be gratis"); Fort Meyers Seafood Packers, Inc. v. Steptoe and Johnson, 127 U.S.App.D.C. 93, 94, 381 F.2d 261, 262 (1967), Cert. denied, 390 U.S. 946, 88 S.Ct. 1033, 19 L.Ed.2d 1135 (1968) (attorney's fees paid by third party: "If appellant is not obligated to pay appellees for their services, it does not follow that there was no attorney-and-client relation"); Dresden v. Willock, 518 F.2d 281, 286 (3d Cir. 1975) ("The fact that Dresden was to be paid by receiving stock in the enterprise did not change the nature of the (attorney-client) relationship"); E. F. Hutton & Co. v. Brown, 305 F.Supp. 371, 388 (S.D.Tex.1969) (Relation of attorney and client "is not dependent on the payment of a fee")
 
 
 [7]
 Udall v. Littell, 125 U.S.App.D.C. 89, 97, 366 F.2d 668, 676 (1966), Cert. denied, 385 U.S. 1007 (1967); E. F. Hutton & Co. v. Brown, supra note 6, at 388
 
 
 [8]
 G. Hazard, Ethics in the Practice of Law (1978) 43; J. Lieberman, Crises at the Bar (1978) 189
 
 
 [9]
 "A lawyer employed or retained by a corporation or similar entity owes his allegiance to the entity and not to a stockholder, director, officer, employee, representative, or other person connected with the entity." ABA, Code of Professional Responsibility, EC 5-18
 
 
 [10]
 Hazard, Supra note 8, at 46-54; Lieberman, Supra note 8, at 189-91. The potential for conflict also exists for the lawyer for the government. Hazard, at 54; Lieberman, at 191-92
 
 
 [11]
 Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp., 294 F.Supp. 1148, 1150 (E.D.Pa.1969) (privilege case); United States v. American Radiator & Standard Sanitary Corp., 278 F.Supp. 608, 614 (W.D.Pa.1967) (privilege case); Schwartz v. Broadcast Music, Inc., 16 F.R.D. 31 (S.D.N.Y.1954)
 
 
 [12]
 ABA Code of Professional Responsibility, EC 4-1: "Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the presentation by the lawyer of confidences and secrets of one who has employed or sought to employ him." Cf. McCormick on Evidence (2d ed. 1972), § 88, p. 179: "Communications in the course of preliminary discussion with a view to employing the lawyer are privileged though the employment is in the upshot not accepted." See also, Taylor v. Sheldon, 172 Ohio St. 118, 173 N.E.2d 892, 895 (1961)
 
 
 [13]
 ABA, Opinions of the Committee on Professional Ethics (1967 ed.), Formal Op. 247 (1942). See also, State Farm Mutual Automobile Ins. Co. v. Walker, 382 F.2d 548 (7th Cir. 1967), Cert. denied, 389 U.S. 1045, 88 S.Ct. 789, 19 L.Ed.2d 837 (1968). For general discussion of conflicts inherent in insurance matters, see H. Drinker, Legal Ethics (1953) 114-18; L. Patterson and E. Cheatham, The Profession of the Law (1971) 237-40
 
 
 [14]
 McCormick on Evidence (2d ed. 1972), § 88, p. 179. See also, R. Wise, Legal Ethics (1970) 284: "The deciding factor is what the prospective client thought when he made the disclosure, not what the lawyer thought."
 
 
 [15]
 Thurmond, paras. 6-8; 448 F.Supp. at 1292
 
 
 [16]
 Hefler, para. 12; 448 F.Supp. at 1294
 
 
 [17]
 Copley, para. 7; 448 F.Supp. at 1294
 
 
 [18]
 Note Attorney's Conflict of Interests: Representation of Interest Adverse to That of Former Client, 55 Bost.U.L.Rev. 61, 66 (1975)
 
 
 [19]
 Supreme Court Order, November 20, 1972
 
 
 [20]
 Rules of Evidence for the United States Courts and Magistrates as approved by Supreme Court (West Pub. Co. 1972), Rule 503(a)(1)
 
 
 [21]
 McCormick on Evidence (2d ed. 1972) § 88, pp. 179-80
 
 
 [22]
 448 F.Supp. at 1292-93
 
 
 [23]
 448 F.Supp. at 1292
 
 
 [24]
 ABA, Code of Professional Responsibility, Canon 4: "A lawyer should preserve the confidences and secrets of a client."
 
 
 [25]
 ABA, Code of Professional Responsibility, Canon 5: "A lawyer should exercise independent professional judgment on behalf of a client."
 
 
 [26]
 ABA, Code of Professional Responsibility, Canon 9: "A lawyer should avoid even the appearance of professional impropriety."
 
 
 [27]
 Schloetter v. Railoc of Indiana, Inc., 546 F.2d 706, 710 (7th Cir. 1976). See also, Fund of Funds, Ltd. v. Arthur Andersen & Co., 435 F.Supp. 84, 96 (S.D.N.Y.), Rev'd in part and aff'd in part, 567 F.2d 225, 229, n.10 (2d Cir. 1977)
 
 
 [28]
 Judge Fairchild notes that he has a different view on this point. It is his understanding that on appeal, Kirkland does not rely on a Chinese wall theory. In his opinion, if it had been established that there was real insulation in all relevant particulars between the lawyers working in the Washington office on the API Report and those working in the Chicago office on the antitrust action, imputation of knowledge to all partners would be eliminated from consideration and a different result may have been appropriate
 
 
 [29]
 The motions to strike appellee's brief and appendix are denied